**STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. IWAN MACUK, DEFENDANT-APPELLANT.**

Argued April 20, 1970—Decided July 22, 1970.

*Mr. Bernard A. Kuttner* argued the cause for defendant-appellant.

*Mr. Robert B. Silverman,* Assistant County Prosecutor, argued the cause for plaintiff-respondent (*Mr. Robert H. Doherty, Jr.,* Ocean County Prosecutor, attorney).

The opinion of the court was delivered by
HALL, J. The defendant was convicted in the Jackson Township Municipal Court of operating an automobile while under the influence of intoxicating liquor, a violation of the motor vehicle act. *N. J. S. A.* 39:4–50(a). The Ocean

County Court heard his appeal on the verbatim record made in the municipal court, R. 3:23–8(a) (formerly R. R. 3:10–10(a)), and also found him guilty. Since it proved to be his second offense within 10 years, he received the mandatory sentence of 3 months in the county jail and forfeiture of his right to operate a motor vehicle for a period of 10 years, as well as a fine of $500. The Appellate Division affirmed in an unreported opinion. He appeals to this court on the basis that a substantial constitutional question is involved. R. 2:2–1(a)(1). That question is the applicability of the rules laid down in *Miranda v. Arizona,* 384 *U. S.* 436, 86 S. Ct. 1602, 16 *L. Ed.* 2d 694 (1966), to motor vehicle offenses, and particularly to drunken driving cases involving various physical tests.

The evidence for the prosecution showed that on the late afternoon of June 13, 1968, Jackson Township police headquarters received a telephone call that there had been an accident at a given location. Two policemen were separately dispatched to the scene. No sign of an accident was found, but an unoccupied car was observed at an angle off the road, partly in a ditch. The doors were locked. Officer Gross, the first to arrive, noticed a man, who proved to be the defendant, sitting on the porch of a nearby house. In response to the officer's question, he admitted he had been driving the car and identified himself. The officer observed that he had a very noticeable odor of alcohol on his breath, that he swayed as he was standing and while walking and that his speech was slurred. (Defendant had emigrated to this country some 10 years earlier and spoke with an accent). He admitted he had been drinking. His general demeanor was otherwise calm and cooperative.

Lieutenant Applegate arrived while Gross was talking to defendant, overheard most of the conversation and made the same observations as to his condition. Both officers testified that defendant was under the influence of alcohol.

Officer Gross then asked defendant to accompany him to headquarters. In view of what followed, the assumption is

that the trip was for the purpose of administering a drunk-ometer test. Lieutenant Applegate testified that Macuk was placed under arrest at the scene at that time. At headquarters Lieutenant Applegate, following a commonly used drinking-driving report sheet form prepared by the state police, asked the defendant further questions which fall into two categories. The first produced responses, largely repetitious of the answers given at the scene, that he was driving the car, that no one was with him, that he was going from a friend's house to his home in Freehold, that he ran off the road into a ditch, and that he had consumed two beers and a shot of whiskey at the friend's house earlier in the day. The second category related to whether he had injured himself, was ill, was taking any medication, had gone without sleep and the like — designed to explore whether the physical symptoms displayed could be caused other than by the ingestion of alcohol and whether medical attention was required. All produced negative replies. Admittedly defendant was not advised prior to questioning at the scene or at headquarters of any right to remain silent, that any statement he might make could be used against him, or of any right to consult counsel prior to interrogation and to the appointment of counsel if indigent.

Officer Gross then read defendant the standard form of information and warning preparatory to administering the breath test. It reads as follows:

I have reason to believe that you have operated a motor vehicle in violation of Section 39:4–50 of the New Jersey Statutes and I have placed you under arrest for violation of this drinking-driving law.

I request that you submit to the taking of the samples of your breath for the purpose of making chemical tests to determine the content of alcohol in your blood.

A record of the test will be made and a copy given to you when the test is completed.

In addition, you may have a person or physician of your own choosing take samples of your breath, blood or urine.

No test will be taken from you forcefully or against physical resistance.

If you refuse to submit to the test, a report will be forwarded to the Director of Motor Vehicles which may result in a loss of your driving privileges for a period of six months.

The officer testified that he asked defendant whether he would submit to the test and that the answer was in the affirmative. Admittedly again no *Miranda* warnings were given.

The drunkometer breath examination was administered by Lieutenant Applegate, who, it was established, was a competent operator of the device, which, it was likewise established, was in proper working order. The test produced a reading of 0.18% by weight of alcohol in the defendant's blood, which exceeds the figure of 0.15% specified by the statute, *N. J. S. A.* 39:4–50.1(3), as creating a presumption "that the defendant was under the influence of intoxicating liquor." Following the test a summons and complaint were issued.

Defendant's proofs need not be detailed (he was represented by counsel). It is sufficient to note that he admitted operating the car and having drunk "two shots" at his friend's house, that he claimed he became ill while driving and that he pulled to the side of the road in order to go to the nearby house to telephone his daughter to come and take him home. He also said that he did not want to "blow the balloon" in the drunkometer, but that the Lieutenant said he must. He did not testify that he did not understand the officers' questions, that he was in such a condition as not to appreciate their import nor that any physical force was used to compel him to take the test.

The evidence was clearly adequate to support the general verdict of guilt beyond a reasonable doubt. Defendant's on-the-scene admission that he had driven the car to the place where it was found supplied sufficient proof of operation. The officers' observation of his physical symptoms and their opinion that he was under the influence of alcohol (which must be taken to mean that in their opinion he had imbibed to the extent that his physical coordination was

deleteriously affected so that he had been operating a motor vehicle while under the influence of intoxicating liquor in violation of *N. J. S. A.* 39:4–50(a), *State v. Johnson,* 42 *N. J.* 146, 164–166 (1964)), made out a prima facie case for the prosecution, without regard to events at headquarters.

There is no merit to defendant's contention that the arrest at the scene without a warrant was invalid, even though neither police officer actually saw defendant driving the car. The general rule in this state is that a valid arrest without a warrant requires the offense to be committed in the "presence" of the officer unless the offense is punishable by imprisonment for more than a year in state prison. *State v. Doyle,* 42 *N. J.* 334, 349 (1964). In fact, the motor vehicle act specifically requires a violation thereof to occur in the officer's presence to substantiate a warrantless arrest. *N. J. S. A.* 39:5–25. But " 'presence' sums up the requirement that the officer know of the event by the use of his senses" ( *State v. Smith,* 37 *N. J.* 481, 495 (1962), *cert. denied,* 374 *U. S.* 835, 83 S. Ct. 1879, 10 *L. Ed.* 2d 1055 (1963)), and an admission of the offense to the officer by the defendant, as here, is sufficient. *State v. Morse,* 54 *N. J.* 32, 35–36 (1969). Furthermore, it has been held, in a drunken driving case, that "notwithstanding the technical invalidity of * * * [an] arrest, the subsequent enforced subjection of the defendant to examination for intoxication * * * [is] justified as an emergency measure to assure the State against loss of evidence of defendant's guilt of an offense which, although not graded a crime, is of a kind which poses an extremely grave menace to the public safety and welfare." *State v. Gillespie,* 100 *N. J. Super.* 71, 85 (App. Div.), *certif. denied,* 51 *N. J.* 274 (1968). And, we add, there was ample probable cause in fact for the arrest and the accompanying requirement of going to headquarters for a breath test.

The State's case was rendered practically impregnable by the drunkometer reading of 0.18%. As previously indicated, this finding exceeded the 0.15% statutory presump-

tive figure. While that presumption is rebuttable, it is, as we said in *State v. Johnson, supra* (42 *N. J.* at 173), where the test produced the same figure as here, "exceedingly strong" and "most difficult to overcome." Those statements were made in the light of "the universally accepted truth," referred to in that opinion, that if at least 0.15% of alcohol is present in the blood, every such person is physiologically under the influence of intoxicating liquor for the purposes of operation of a motor vehicle "regardless of the extent of usual external manifestations, individual tolerance for alcohol or pre-existing individual physical conditions or idiosyncrasies." 42 *N. J.* at 169.

Defense counsel very correctly conceded at oral argument that the investigatory, on-the-scene questioning earlier set forth did not require first giving the *Miranda* warnings. *Miranda v. Arizona, supra* (384 *U. S.* at 477–478, 86 S. Ct. 1602, 16 *L. Ed.* 2d at 725–726) ; *State v. Zucconi,* 50 *N. J.* 361, 363–364 (1967) ; *State v. Gosser,* 50 *N. J.* 438, 445–446 (1967), *cert. denied,* 390 *U. S.* 1035, 88 S. Ct. 1434, 20 *L. Ed.* 2d 295 (1968) ; *State v. Barnes,* 54 *N. J.* 1, 5–7 (1969), *cert. denied,* 396 *U. S.* 1029, 90 S. Ct. 580, 24 *L. Ed.* 2d 525 (1970). So defendant's *Miranda* argument, grounded in trial motions to strike testimony and for dismissal, relates only to the questioning at police headquarters and to the subjection to the drunkometer test. While the contention as applied to the later procedure is couched in the terminology of the lack of "voluntarily and understandingly made consent", reference in the brief to the absence of counsel indicates we should also treat the point as urging that the full protections of *Miranda* are required before an alcohol test can be administered.

The *Miranda* argument should be considered in the framework of New Jersey's statutes and procedure relating to drunken driving. At the outset it is to be borne in mind that motor vehicle violations are not "crimes" in this state, but only petty offenses. There is no right to indictment or to a jury under any circumstances and such matters are

tried in the first instance in a summary manner in the
Municipal Court. It is not considered a "criminal prosecu-
tion." See *State v. Zucconi*, 93 *N. J. Super*. 380, 384–387
(App. Div. 1967), *aff'd* 50 *N. J*. 361 (1967). No jail sen-
tence for a motor vehicle violation may exceed six months
and imprisonment for that length of time is authorized, so
far as we are aware, in only one instance (a second offense
of leaving the scene of an accident resulting in injury or
death to any person. *N. J. S. A.* 39:4–129(a)). *Cf. Bald-
win v. New York*, 399 *U. S*. 66, 90 S. Ct. 1886, 26 *L. Ed.*
2d 437 (1970).

Prior to 1966, the two pertinent sections of the motor
vehicle act dealing with drunken driving were *N. J. S. A.*
39:4–50 and 50.1. The first designated operation "while
under the influence of intoxicating liquor" as an offense
and prescribed the penalties. Generally speaking, for a first
offense a fine of not less than $200 nor more than $500, or
imprisonment for not more than three months in the county
jail or workhouse, or both, was prescribed, plus forfeiture
of the right to operate a motor vehicle over the state's high-
ways for a period of two years. For a subsequent violation
within 10 years of the previous conviction, the penalty was
a mandatory three month sentence together with a 10 year
operation forfeiture.

The second cited section dealt with chemical analyses to
determine the percentage of alcohol in a driver's blood. It
impliedly authorized the use of such scientific tests of the
defendant's "blood, urine, breath or other bodily substance"
and assumed the admissibility of the results, stating that
they "shall give rise to the following presumptions":

1. If 0.05% or less by weight of alcohol in the de-
fendant's blood — a presumption that defendant was not
under the influence of intoxicating liquor.

2. If in excess of 0.05% but less than 0.15% — no
presumption one way or the other, but the test result
may be considered with other competent evidence in
determining guilt or innocence.

3. If 0.15% or more — a presumption that the defendant was under the influence of intoxicating liquor. The section went on to say that it should not be construed to require evidence of the amount of alcohol in the blood to be presented nor as limiting the introduction of any other competent evidence and closed with this important sentence · "No chemical analysis, as provided in this section, or specimen necessary thereto, may be made or taken unless expressly consented to, or requested by, the defendant." This sentence rendered nugatory in this particular situation Evidence Rule 25, *N. J. S.* 2A:84A–19, adopted in 1960, providing that "no person has the privilege [against self-incrimination] to refuse to submit to examination for the purpose of discovering or recording his corporal features and other identifying characteristics or his physical or mental condition."

This court in *State v. Blair*, 45 *N. J.* 43 (1965), reiterated that certain types of examination or inspection, including fingerprinting, photographing, examination of the body of a person for identifying characteristics and drunkometer tests and blood tests, were beyond the privilege against self-incrimination because non-testimonial in character. We specifically held therefore, in a drunken driving case, where a sample of blood had been taken for alcohol testing, that a defendant did not have to be informed that, because the results may be used against him, he can refuse to allow the test, although, by reason of the last sentence of *N. J. S. A.* 39:4–50.1, the State had to establish that the defendant gave express consent for the taking of the blood specimen.

*L.* 1966, *c.* 141 and 142, enacted June 18 of that year and effective on the 91st day thereafter, made significant changes in the drunken driving provisions. In the first place, a new and lesser offense was created — operation of a motor vehicle "while * * * ability to operate * * * is *impaired* by the consumption of alcohol" — with lesser penalties (no jail term is authorized) and license forfeiture periods. *C.* 141, sec. 1(b); *N. J. S. A.* 39:4–50(b). (Emphasis added).

While "impaired" is not specifically defined, c. 141, sec. 2, *N. J. S. A.* 39:4–50.6, sets forth a comparable schedule of presumptions from the results of chemical analysis of blood, urine, breath or other bodily substance as in the case of driving "under the influence", previously outlined, but utilizing 0.05% and 0.10% as the crucial figures instead of 0.05% and 0.15%. Chapter 141, sec. 3, *N. J. S. A.* 39:4–50.7, provides that a person shall not be convicted of both offenses as a result of the same occurrence, but that an acquittal of driving "under the influence" shall not prohibit a prosecution for driving "while impaired". It is obvious that the latter is a lesser included offense.

Chapter 142, importantly, struck from *N. J. S. A.* 39:4–50.1 the former requirement of consent to or request by the defendant for any chemical analysis or specimen with respect to driving "under the influence". (And no such requirement was contained in *N. J. S. A.* 39:4–50.6 with respect to driving "while impaired".)

Section 2 of the chapter, *N. J. S. A.* 39:4–50.2, is the so-called "implied consent" provision, relating only to the taking of samples of *breath*. It reads:

(a) Any person who operates a motor vehicle on any public road, street or highway or quasi-public area in this State shall be deemed to have given his consent to the taking of samples of his breath for the purpose of making chemical tests to determine the content of alcohol in his blood; provided, however, that the taking of samples is made in accordance with the provisions of this act and at the request of a police officer who has reasonable grounds to believe that such person has been operating a motor vehicle in violation of the provisions of section 39:4–50 of the Revised Statutes.

(b) A record of the taking of any such sample, disclosing the date and time thereof, as well as the result of any chemical test, shall be made and a copy thereof, upon his request, shall be furnished or made available to the person so tested.

(c) In addition to the samples taken and tests made at the direction of a police officer hereunder. the person tested shall be permitted to have such samples taken and chemical tests of his breath, urine or blood made by a person or physician of his own selection.

(d) The police officer shall inform the person tested of his rights under subsections (b) and (c) of this section.

(e) No chemical test, as provided in this section, or specimen necessary thereto, may be made or taken forcibly and against physical resistance thereto by the defendant.

It would appear that the provision was limited to a breath test and was made necessary because affirmative cooperation is required of the person being examined to "blow up the balloon", whereas this is not so in the case of a test by use of a blood sample. It also may be noted that the implied consent provision applied where the police officer has arrested the driver upon reasonable cause to believe that he was either "under the influence" or that his driving ability was only "impaired".

Section 4 of chapter 142, *N. J. S. A.* 39:4–50.4, authorizes an additional six month license revocation penalty (see *Bean v. Strelecki*, 101 *N. J. Super.* 310 (App. Div.), *certif. denied,* 52 *N. J.* 491 (1968)), administratively imposed by the Director of Motor Vehicles, when a driver refuses to participate in a breath test.

Two days after chapters 141 and 142 were approved and a week after it handed down *Miranda,* the United States Supreme Court decided *Schmerber v. California,* 384 *U. S.* 757, 86 *S. Ct.* 1826, 16 *L. Ed.* 2d 908 (1966). In that case the defendant was injured in an automobile accident and taken to a hospital. While there he was arrested on adequate probable cause for driving a vehicle under the influence of intoxicating liquor. He refused, on the advice of counsel, to consent to the taking of a blood sample. At the direction of a police officer, the sample was withdrawn anyway by a physician at the hospital in a simple, medically acceptable manner. Testing of the blood indicated intoxication and evidence thereof was introduced at the trial over defendant's objection on constitutional grounds. No mention is made of any state statute relating to the subject. The conviction was affirmed.

The court, by Mr. Justice Brennan, held (1) the taking of a blood sample under such conditions did not violate the due process clause; (2) it did not violate the privilege against

self-incrimination because the event was non-testimonial in character (as we had earlier held in *State v. Blair, supra,* 45 *N. J.* 43) ; (3) no proper issue of the Sixth Amendment right to the assistance of counsel was presented; and (4) there was no unreasonable search and seizure. That there can be no violation of the right to counsel in alcohol test situations is clearly indicated by the same Justice in the later case of *United States v. Wade,* 388 *U. S.* 218, 87 S. Ct. 1926, 18 *L. Ed. 2d* 1149 (1967), when he said, with specific reference to blood samples *inter alia*:

* * * We think there are differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial. (388 *U. S.* at 227-228, 87 S. Ct. at 1932, 18 *L. Ed. 2d* at 1158).

See also *Gilbert v. California,* 388 *U. S.* 263, 267, 87 S. Ct. 1951, 18 *L. Ed.* 2d 1178, 1183 (1967).

The upshot of our statutory provisions and their history and the holdings of the United States Supreme Court is this. There is a clear legal right to require a motor vehicle operator, arrested on probable cause for driving "under the influence" or "while impaired", to submit to a chemical test of bodily substances to determine the amount of alcohol in his blood, or, for that matter, to a physical coordination test. A breath test must, of course, be administered in accordance with the requirements of *N. J. S. A.* 39 :4-50.2 and a blood test in a medically acceptable manner and environment. The latter may be used on any occasion, but will be especially useful where the person is physically unable or has refused to take a breath test. Since such

tests, properly undertaken, violate no constitutional safeguard and are permissible as in any other non-testimonial situation and since our statute no longer requires consent in any situation, acquiescence is not legally significant or necessary. See *State v. Tolbert,* 100 *N. J. Super.* 350 (Cty. Ct. 1968). There is no legal right or choice to refuse, despite the authorized additional penalty for refusal in the case of the breath test. So it is inappropriate to warn that a test need not be taken, although it is quite fair to advise of the consequences of refusal to take a breath test. (See standard information and warning previously quoted.) See *State v. Kenderski,* 99 *N. J. Super.* 224 (App. Div. 1968). Consequently the *Miranda* requirements are not applicable at all. It follows that defendant's contention that he did not voluntarily or understandingly consent to take the breath test and that he was entitled to the advice of counsel with respect thereto obviously has no merit.

This leaves the matter of the applicability of *Miranda* to the short, limited pre-test questioning at police headquarters. We could dispose of this issue on the basis of harmless error in that the interrogation produced no more inculpatory information than had the previous permissible on-the-scene investigatory inquiries. However, because the issue is substantial and there is need to give guidance to lower courts, we should pass the harmless error ground and reach the merits. The Appellate Division in *State v. Zucconi, supra* (93 *N. J. Super.* 380), held that the requirement did not apply in the motor vehicle violation there before it. When the case reached this court, we found determination of the question unnecessary to the decision and declined to consider it. 50 *N. J.* 361, 364. We later held that the doctrine of *Miranda* did not apply in license suspension or revocation proceedings before the Director of Motor Vehicles, the imposition of punitive sanctions not being involved. *David v. Strelecki,* 51 *N. J.* 563 (1968). Now, with the problem squarely before us, we are of the opinion that, in view of the absence of any indication to the contrary by the

United States Supreme Court, the rules of *Miranda* should be held inapplicable to all motor vehicle violations.

The question has arisen in other jurisdictions, with some variety in result, but the seeming majority of the cases indicates the view we espouse. Examples of decisions to that effect are *State v. Tellez*, 6 *Ariz. App.* 251, 431 *P.* 2d 691, 25 *A. L. R.* 3d .1063, 1070–1071 (Ct. App. 1967); *State v. Bliss, Del.*, 238 *A.* 2d 848 (1968); *State v. Pyle*, 19 *Ohio St.* 2d 64, 249 *N. E.* 2d 826 (1969), *cert. den.* 396 *U. S.* 1007, 90 S. Ct. 561, 24 *L. Ed.* 2d 498 (1970). Instances of an opposite view may be found in *Commonwealth v. Bonser*, 215 *Pa. Super.* 452, 258 *A.* 2d 675 · (Super. Ct. 1969) (the statute here authorized a sentence of up to three years for driving while "under the influence"); *People v. McLaren*, 55 *Misc.* 2d 676, 285 *N. Y. S.* 2d 991 (Dist. Ct. 1967). See also *People v. Gursey*, 22 *N. Y.* 2d 224, 292 *N. Y. S.* 2d 416, 239 *N. E.* 2d 351 (1968); *People v. Phinney*, 22 *N. Y.* 2d 288, 292 *N. Y. S.* 2d 632, 239 *N. E.* 2d 515 (1968).

The reasons for our view may be briefly summarized. First, the type of police questioning involved in motor vehicle violations is not ordinarily the lengthy, incommunicado inquisition seeking to "sweat out" a confession at which *Miranda* was aimed. Generally it encompasses only simple standard inquiries for the purpose of a necessary accident or violation police report, even though some of the information obtained may go beyond the so-called investigatory phase and be inculpatory as to the violation. The fundamental reason for the *Miranda* rules is just not present. (We are not speaking of questioning about a full-blown crime of some kind which may have come to light as a result of the stopping of an automobile for a motor vehicle violation.) Secondly, the violations involved are not serious enough in their consequences to warrant the time consuming interference which would result to effective law enforcement and the expeditious administration of justice in petty offense cases. Thirdly, as a purely practical matter, it would be utterly impossible .to provide sufficient lawyers to consult with the number of

motor vehicle violators who would be likely to request legal advice. In this state during the court year 1968–69, 726,763 non-parking traffic complaints were filed in the municipal courts, of which 38%, or over 275,000, were disposed of by court hearing. Certainly a substantial percentage of those involved police questioning of indigent defendants which went beyond investigatory aspects and who could demand the furnishing of a lawyer prior to interrogation if *Miranda* were to be held applicable. The massive impossibility of doing so is manifest. Therefore there was no error here in refusing to strike the testimony of the police officers concerning the questioning of defendant at police headquarters.

One other phase of the case must be mentioned, although it was not raised by the defendant. As was earlier said, a fine of $500 was imposed in addition to the mandatory jail term and license revocation. We find no warrant in *N. J. S. A.* 39:4–50(a) for the imposition of a fine in a second offender case occurring within 10 years of the first conviction, that authority being limited to violations by first offenders and second offender violations happening more than 10 years after the first. The judgment must, therefore, be modified to vacate the fine.

The judgment of the Appellate Division as so modified is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—7.