165 N.J. Super. 19 (1978)
397 A.2d 686
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
HENRY MANNING, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 6, 1978.
Decided December 26, 1978.
*22 Before Judges CONFORD, PRESSLER and KING.
*23 Ms. Susan Slovak, Assistant Deputy Public Defender, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender of New Jersey, attorney).
Ms. Maris Konray, Deputy Attorney General, argued the cause for respondent (Mr. John J. Degnan, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by KING, J.A.D.
Defendant was found guilty by a jury of breaking and entering with intent to rob (N.J.S.A. 2A:94-1), robbery (N.J.S.A. 2A:141-1), conspiracy to commit robbery (N.J.S.A. 2A:98-1), and contributing to the delinquency of a minor (N.J.S.A. 2A:96-4). He was sentenced to an aggregate five to seven years State Prison sentence and now appeals raising multiple points of trial error.
Defendant's convictions arose out of a criminal episode occurring at the residence of an elderly Plainfield couple in December 1975. Defendant's convictions were premised on the State's contention that he aided, abetted and conspired with a juvenile G.K. in the commission of the crimes. G.K. had pleaded guilty to the offenses and was sentenced to a term of incarceration prior to defendant's trial.
The State offered proof from which the jury could have believed these general facts about the episode: On the evening of the criminal event the victims, Mr. and Mrs. Braun, were at home on Carnegie Avenue in Plainfield. At about 5:20 P.M. Mr. Braun looked out to see if his newspaper had been delivered. He noticed a dark-colored car travelling north on the poorly lighted street. Thirty seconds later he heard the storm door open and thought it was the paper boy. Braun then looked up and saw an arm thrust through the door holding a gun pointed at him.
Mrs. Braun was talking on the telephone when she heard her husband's shout to come to the living room. She responded immediately and saw the juvenile intruder G.K. holding a handgun to Mr. Braun's head. G.K. then ordered *24 the couple to a bedroom at gunpoint, and threatened to kill Mr. Braun if they did not give him some money. The Brauns were able to produce about $50 for the robber. The Brauns were told to lie down in the bedroom and G.K. left the room. Several minutes passed and then the Brauns heard a noise. They rushed to the front door where they met several police officers who told them to wait outside.
At about 5:20 P.M. the Plainfield police had by radio transmission directed all available units to proceed to the Brauns' home on Carnegie Avenue to investigate a breaking and entering in progress. Detectives Irovando and Newman were driving home from work in a private car; they picked up the transmission and arrived on the scene first. Other officers arrived seconds later. Irovando and Newman observed defendant's 1970 four-door maroon Ford parked on Carnegie Avenue about one house north of the Brauns' house.
The detectives parked, left their car, walked around to the driver's side of the defendant's car, and saw the defendant "slumped down" behind the wheel. The motor was running and car lights were off. Defendant was alone in his car. Officer Ronsley arrived a few seconds after the detectives. Ronsley was ordered by the detectives to "secure" the Ford and its occupant. Ronsley said he understood that it was his duty to keep defendant and his car at the scene pending developments.
As Ronsley approached defendant's car he observed defendant "slouched down" behind the steering wheel. Ronsley told defendant to keep his hands on top of the steering wheel. Defendant then volunteered this statement to Ronsley: "I ain't done nothing. I'm just on my way home to rest." Ronsley requested and defendant produced a valid license and registration. During the conversation defendant said he now lived in Montclair and used to live in Plainfield. Ronsley then asked defendant to get out of his car. Defendant said he had two artificial legs and could not comply. Both of his legs had been amputated as a result of phlebitis. Ronsley thereafter noticed a pair of crutches and a black hat in the *25 backseat. Defendant was wearing a fishing hat and Ronsley thought it unusual that there was another hat in the car. Ronsley asked if the hat was his and the defendant replied that it was.
Meanwhile Detectives Irovando, Newman, Dilkes and Ham had surrounded the house, the Brauns had run out the front door, and the police had entered the house and had fanned out to search for G.K. Detectives Dilkes and Newman found G.K. in a closet in the dining room, arrested and handcuffed him. They searched G.K. and discovered $60 in a pocket and an unloaded .22-caliber revolver tucked in his pants.
After being told of G.K.'s arrest inside the house Officer Ronsley asked defendant to try on the black hat and he complied. Ronsley observed that the hat was obviously too small for defendant. This demonstration was repeated at trial before the jury. At the request of the police and in the company of an Officer Treadwell, defendant drove his own car to the police station. The car was equipped with manual controls enabling defendant to drive despite the loss of his legs. At the police station Detective Dilkes told defendant he was being charged with armed robbery and read his Miranda warnings to him. A search of defendant's person produced two .32-caliber bullets, incompatible with the .22-caliber weapon found on G.K.
Following defendant's arrest at the station house Detective Dilkes told him that G.K. had been arrested and had given a statement implicating defendant in the robbery. Defendant denied any knowledge of the armed robbery. He shook his head negatively and stated to Dilkes that he "should have ought to let the kid steal that lady's pocket." Dilkes said he thought the defendant "cut himself short and that he would have said something else, but didn't." The interrogation then ceased.
In addition the State produced evidence that defendant's car was processed for latent fingerprints which revealed a *26 print matching G.K.'s left index finger on the inside of a window. Defendant did not testify or offer any proofs.
The key evidence linking defendant to G.K. as an aider and abettor was (1) the fingerprint in his car, (2) the black hat which was too small for defendant but which inferentially could have fit the juvenile, G.K., and (3) defendant's statements at the scene and in the station house. Defendant raises numerous points of error in his appeal from the judgment of conviction and the sentence.

I
We first consider defendant's contention that the trial judge committed reversible error when he admitted into evidence the statements he made while in his automobile on the scene before he was escorted to the station house, arrested, searched and given his Miranda warnings. It was during this verbal exchange that defendant told Officer Ronsley, "I ain't done nothing. I'm just on my way home to rest," and claimed ownership of the undersized black hat, which he later donned at Ronsley's request. When ruling that these statements were not the product of a custodial interrogation the trial court stated: "The question is all the circumstances. And I find for all intents and purposes he was not in custody within the meaning of Miranda at the time he made these statements."
The United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 377-378, 86 S.Ct. 1062, 16 L.Ed.2d 694 (1966), observed that warnings need not be given during "general on-the-scene questioning as to the facts surrounding a crime or other general questioning of citizens in the fact-finding process." Nor does the holding in Miranda bar the admission of any statement secured under noncustodial circumstances "given freely and voluntarily without any compelling influences." Id. See also, State v. Gosser, 50 N.J. 438 (1967), cert. den., 390 U.S. 1035, 88 S.Ct. 1434, 20 L.Ed.2d 295 (1968).
*27 In this case defendant was not under arrest when he spoke with Officer Ronsley. G.K. had not yet been arrested and no crime in progress had actually been confirmed when Ronsley first engaged defendant in conversation. Defendant was a suspect to the extent that anyone in the area might at this point have been a suitable subject for investigation. The officer said that a manned get-away car nearby is often found at the scene of breakings and enterings. Defendant's statement as to his purpose and his acknowledgement of ownership of the hat were made before officer Ronsley was told that G.K. had been apprehended in the house. Defendant's only comments at the scene were essentially neutral, for identification, or ostensibly exculpatory. The claim of ownership of the hat however turned out to be incriminatory; but the officer had not yet set forth to pry incriminating statements from him as was later done at the police station.
Defendant was never told by Ronsley that he was not free to go. Nor did defendant know that Ronsley had been instructed by the detectives to keep him at the scene. Defendant's exculpatory statements that he "didn't do nothing" and "just stopped here to rest" after a few drinks were not the product of any questioning, but were totally volunteered. Defendant was not frisked or forced to alight from his car during this ten-minute conversation, which also included a discussion of where defendant had lived and the disability to his legs.
There was an adequate basis in the record to support the judge's factual finding that this curbside discussion between defendant and the officer was not inherently coercive and therefore not a custodial interrogation. The observation of our Supreme Court in State v. Barnes, 54 N.J. 1, 6-7 (1969), cert. den., 396 U.S. 1029, 90 S.Ct. 580, 24 L.Ed.2d 525 (1960), that "[i]t seems clear to us that the essence of the situation was not an officer imposing a process of interrogation upon a suspect, but an officer reacting naturally and spontaneously to the scene before him" is appropriate to this situation. See also, State v. Graves, 60 N.J. 441, 450 *28 (1972); State v. Seefeldt, 51 N.J. 472, 482-483 (1968). The two cases relied upon by defendant are factually quite distinguishable. In State v. Godfrey, 131 N.J. Super. 168, 175-178 (App. Div. 1974), aff'd o.b. 67 N.J. 267 (1975), the court upheld the suppression of a confession extracted from an illiterate suspect after an uncounselled two-hour polygraph session in police headquarters during which the defendant was told that the test revealed he lied. In United States ex rel Russo v. State of N.J., 351 F.2d 429 (3 Cir.1965), vac. 384 U.S. 889, 86 S.Ct. 1914, 16 L.Ed.2d 995 on other grounds (1966), cert. den., 384 U.S. 1012, 86 S.Ct. 1916, 16 L.Ed.2d 1018 (1966), defendant was apprehended after being shot during a robbery. He was taken to a hospital by police, handcuffed to his bed, kept under constant police guard, and thereafter confessed following an operation for removal of the bullet.
We conclude that in the circumstances of this case the officer was entitled to approach defendant, observe the general situation, obtain identification and make casual inquiry about a seemingly noninculpatory object, the black hat. Nothing in the circumstances of the encounter, up until the time the officer learned of G.K.'s apprehension in the Brauns' house, is suggestive of an intimidating atmosphere inherent in an interrogation in a custodial environment. See Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d (1976); cf. Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). We hold that the record sustains the conclusion that these statements were the product of legitimate on-the-scene inquiry by an alert and conscientious officer, not the product of a custodial interrogation.

II
Defendant contends that Detective Dilkes' statement in the jury's presence that G.K. allegedly implicated him in *29 the robbery violated the hearsay rule and more fundamentally his right to confront witnesses against him guaranteed by the New Jersey and Federal Constitutions. The State had initially planned to use G.K. as a witness but he recanted and actually testified out of the presence of the jury that he committed the crime unassisted by the defendant. Therefore, the jury never knew that G.K. in fact implicated defendant.
Following G.K.'s recantation the State obtained a preliminary ruling permitting the prosecutor to inquire about the background of defendant's station house interrogation following receipt of his Miranda warnings. With the court's permission the prosecutor asked the following question: "At the time you interviewed him, what if anything did you say to Mr. Manning?" Detective Dilkes responded: "At the time I advised him that he was being charged with armed robbery at the home of the Braun residence and that he had been implicated in the incident by the K. youth." The court then instructed the jury as follows:
Members of the Jury, on this point I instruct you as follows: This statement as to the defendant being implicated by the K. youth is allowed into evidence for your consideration only for the purpose of giving you the background for the response that  any response the defendant may have made to what Detective Dilkes said to him. You're not to consider this in any way as proof that somebody else, specifically the juvenile, implicated the defendant in this crime. The juvenile is not in Court and his testimony most likely will not be adduced and you're not to speculate either way about the reasons for that and as you can appreciate in police work it may very well be that in order to get some response from a suspect, they may represent something to the suspect that is not really true for the purpose of getting some response from him, but you're not to speculate about that, whether it's true or not and I'm telling you to and instructing you very specifically disregard this portion of what Detective Dilkes told the defendant as any proof that somebody else was involving this defendant or saying that he was implicated in this incident. Again, it is simply for you to judge what weight if any is to be given to the response, any response the defendant may have made to the statement.
After the jury was thus cautioned Detective Dilkes replied to the prosecutor's inquiry about what defendant said as *30 follows: "I don't have my report exactly, but he shook his head in a negative way and stated to me that he should have ought to let the kid steal that lady's pocket and then he cut himself short and that was the end of the interview." When asked specifically about defendant's manner of expression Dilkes said further: "Just that I felt he had cut himself short and that he would have said something else, but didn't. * * * Just that when he said that and he ended up with the word pocket, he just stopped immediately and looked up at me and just indicated that he wasn't going to say anything more." Dilkes also told the jury that defendant specifically denied any knowledge of the armed robbery. Following Dilkes' testimony defendant made a timely motion for a mistrial on constitutional grounds, which was denied.
The trial judge's cautionary instruction carefully, emphatically and timely pointed up to the jury that Dilkes' statement that G.K. had implicated the defendant was only offered to give the background through which defendant's incriminatory statement linking him with G.K. on the evening of the crime was elicited. The jury was clearly told that the statement was not offered as proof of a purported accusation by G.K. and could not be interpreted by it as evidence of anything other than the use of an interrogation technique frequently employed by the police: i.e., "a co-suspect has confessed and implicated you so you might as well talk." Confessions obtained by this method of interrogation are admissible in evidence, whether obtained by subterfuge or not, so long as the statement is voluntary and the will of the subject is not overborne. Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); Commonwealth v. Jones, 457 Pa. 423, 322 A.2d 119, 126 (Sup. Ct. 1969); People v. Houston, 36 Ill. App.3d 695, 344 N.E.2d 641, 646-647 (App. Ct. 1976); United States ex rel. Brandon v. LaVallee, 391 F. Supp. 1150, 1152 (S.D.N.Y. 1974); Annotation, "Confession-fraud-trickery-effect," 99 A.L.R.2d 772, 794 (1965); 29 Am. Jur.2d, Evidence, § 572 at 629. "A confession induced by deception *31 or trickery is not inadmissible unless the method used was calculated to produce an untruthful confession or was offensive to due process." Wharton, Criminal Evidence (13th Ed. 1973), § 685 at 471-474. The hearsay rule is not violated where the hearsay statement is not offered to prove the truth of the matter asserted, Evid. R. 63, and the jury is properly instructed on the limited and nonprobative purpose of admissibility. Evid R. 6.
Defendant further asserts that "it is the well-settled rule in this jurisdiction that when the State offers testimony of an unavailable declarant which inescapably points to a defendant's guilt" such testimony violates not only the hearsay rule but the accused's right to confront witnesses against him, citing State v. Bankston, 63 N.J. 263, 268-269 (1973). In Bankston the Supreme Court reversed defendant's heroin possession conviction which was based in large part on the testimony of Detectives Genzone and Walsh. Genzone testified that shortly before defendant was arrested he and the other officers had talked to an informer, and based on information then received they went to the tavern where defendant was apprehended. Genzone said the officers entered the tavern looking for an individual fitting defendant's description with narcotics in his possession. Genzone referred to defendant as the person who fit the description and as the person they were looking for. Walsh also testified that defendant fit the description "that we had obtained." During summation the prosecutor referred to the informant's identification of defendant as the person who would be in possession of heroin. The drugs were not found on defendant's person but under a pair of gloves on the bar. Others were in the bar. Therefore the inference that the informant told the police that defendant would have drugs on him was very useful evidence supporting the State's claim of defendant's constructive possession of the drugs.
In Bankston the assertion by the unavailable declarant that defendant was the person who possessed drugs was squarely before the jury as a substantive assertion of truthful fact. *32 The trial judge's efforts to correct the flawed proceedings were both feeble and wide of the mark. The prosecutor compounded the problem by relying on the hearsay assertion in summation. The Supreme Court concluded: "Thus the jury was led to believe that an unidentified informer, who was not present in court and not subjected to cross-examination, had told the officers that defendant was committing a crime." Id. at 271. The Supreme Court was satisfied that the trial court's instructions to the jury "did not remove the prejudicial effect of that testimony from the minds of the jury," Id. at 272, and agreed with the Appellate Division that the instructions "did not, with sufficient clarity and force, relate to the objectionable references so as to remove them from the minds of the jury." Id. at 268.
In the present case the cautionary instructions were articulate, timely, and forceful. The jury was told: "you're not to consider this in any way as proof that somebody else, specifically the juvenile, implicated defendant in this crime." And further: "You can appreciate in police work it may very well be that in order to get some response from a suspect, they may represent something to the suspect that is not really true for the purpose of getting some response from him." The prosecutor did not attempt in any way to take improper or excessive advantage of the limited purpose of the offer, as was done in Bankston.
Defendant contends that cautionary instructions on the limited use of evidence are not a satisfactory assurance that defendant's constitutional rights were protected, citing Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring). We do not deem the court's instruction defective in any respect and we will not assume that the jury was incapable of following a lucid, timely instruction on the limited use of evidence. Frazier v. Cupp, 394 U.S. 731, 734-736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). Our entire system of criminal justice relies to a *33 large extent on the assumption that jurors will listen to the judge's instructions and follow them in dispassionately weighing the evidence. Judges may expect, "as they must if our judicial system is to survive, that conscientious jurors will respect and follow the instruction[s]." State v. Manley, 54 N.J. 259, 270, (1969). It is only when we are persuaded that the impact of particular prejudicial material will probably overbear reasonable conscientiousness that we reject the efficacy of a cautionary instruction. We do not regard the potential impact here to be of such a degree. We think modern jurors are sufficiently sophisticated to understand that acceptable police interrogation methods may legitimately include artifice employed by a police officer to dissipate a suspect's reluctance to confess or implicate himself. State v. Miller, 76 N.J. 392, 403 (1978); See, State v. Dennis, 43 N.J. 418, 425 (1964). Our Supreme Court has long recognized that "clear, immediate and emphatic precautionary instructions to the jury" where evidence is offered, not for the truth of the matter asserted, but merely as a foundation for a witness' testimony effectively protect a defendant's constitutional rights in a serious criminal case, State v. Manley, supra, 54 N.J. at 270; State v. Ordog, 45 N.J. 347, 356 (1966), cert. den., 384 U.S. 1022, 86 S.Ct. 1942, 16 L.Ed.2d 1025 (1966); State v. Lucas, 30 N.J. 37, 79-80 (1950), and we agree.

III
Defendant next contends that his constitutional right to remain silent was infringed upon when Detective Dilkes told the jury that defendant terminated the interview after starting to make a statement. We disagree. The jury was fully and carefully instructed on the defendant's right to remain silent, as well as his right to stop making a statement at any time. They were told they could draw any reasonable inference from what defendant said, "but you can't conjecture about what he did not say." The judge stated with respect to defendant's custodial questioning:
*34 I also charge you that in addition to having a right to remain silent and make no statement and his right to not being required to deny any facts that he's confronted with also includes the right to if he does make a statement to cease making a statement at anytime. Similarly, therefore, his failure if he has given a partial statement, his failure to complete that statement, or to even complete his sentence is not to be used as a basis for any inference of guilt and it is not to be the subject of any speculation on the part of you in your deliberations as to what he may have intended to say or what he would have said if he continued speaking.... Again, you consider what he said, but not what he didn't say.
Detective Dilkes simply repeated what defendant said and how he said it. The State did not improperly attempt to exploit defendant's belated assertion of his right not to speak. The judge meticulously instructed the jury on the use of the post-Miranda admission by the defendant.
This is not a case where the State sought to improperly impeach a defendant's assertion of innocence at trial by the use of his post-arrest silence. State v. Lyle, 73 N.J. 403 (1977). The State only sought to use permissible inferences from defendant's statements and conduct shortly post-arrest which were inconsistent with innocence, not to use impermissible inferences from ambiguous custodial silence. See State v. Deatore, 70 N.J. 100, 107-108 (1976).
We consider defendant's additional contentions that his statements were improperly admitted in violation of Evid. R. 4, Evid. R. 55 and Evid. R. 63(7) to be patently without merit. R. 2:11-3(e)(2).

IV
Defendant asserts that there was no proper determination of the voluntariness of the statement he is alleged to have made at the police station after receiving his Miranda warnings. Defendant also asserts that there was no proper finding by the court that he waived his Miranda warnings and that his request for counsel was improperly disregarded. There is no doubt the record lacks the requisite findings by the trial judge. A trial judge is specifically required to make *35 a finding not only that the constitutionally mandated warnings were given, but that defendant knowingly and intelligently waived his right to remain silent, and that any statement was voluntary, State v. Hampton, 61 N.J. 250, 272 (1972), all beyond a reasonable doubt. State v. Miller, 76 N.J. 392, 404-405 (1978); State v. Yough, 49 N.J. 587, 600-601 (1967).
The State argues that a finding as to voluntariness and waiver is logically implicit in the trial judge's conclusion that the prosecution submitted sufficient evidence to permit defendant's statement to go to the jury. Where valuable rights of a defendant in a criminal case are involved we cannot afford to be so indulgent. Nowhere in the record do we find a specific ruling on voluntariness or waiver, and nowhere does the court allude to the appropriate burden of proof.
We therefore find it necessary to remand for the limited purpose of requiring the trial judge to make findings of facts and conclusions of law on the issues of the voluntariness of the statement, and the waiver of the Miranda warnings, which defendant concedes he received. This is necessary to our performance of our appellate duty to conduct a "searching and critical" review of the trial court's determination. State v. Pickles, 46 N.J. 542, 577 (1966). If the trial court concludes that the State failed to establish voluntariness and waiver beyond a reasonable doubt the defendant will be entitled to a new trial at which the statement would be excluded. If the findings on voluntariness and waiver are in the affirmative beyond a reasonable doubt the conviction stands. State v. Kelly, 61 N.J. 283, 294-295 (1972). In view of the limited nature of the remand we retain jurisdiction in the event the findings and conclusions are adverse to defendant and he wishes to appeal therefrom.
In the event that the findings and conclusions on the limited remand are adverse to the defendant and his conviction stands the trial judge should immediately file appropriate copies of his opinion with this court. Counsel *36 will thereafter have 20 days to file letter briefs commenting thereon, including any request for oral argument. The trial judge is directed to file his rulings on this issue within 30 days of the date of the filing of this opinion.

V
We find defendant's remaining contentions that (1) the money found on G.K. and the black hat were inadmissible, (2) the court erred in not directing a verdict of acquittal on the charges on which he was found guilty, (3) the verdict was against the weight of the evidence, (4) the doctrine of cumulative error requires a new trial, and (5) the sentence was manifestly excessive, to be clearly without merit. R. 2:11-3(e)(2).
Remanded, jurisdiction is retained.
CONFORD, P.J.A.D. (dissenting).
In my view, the admission, over objection, of the testimony of Detective Dilkes that he informed defendant at the police station that the juvenile G.K., who was caught red-handed at the scene of the crime, had implicated defendant in the crime, was inadmissible hearsay violative of defendant's Sixth Amendment right of confrontation of the absent G.K. and irreparably prejudicial to defendant on the issue of his guilt or innocence. These conclusions are based on (1) the lack of realism in the notion that the court's instructions to the jury could eradicate the effect of the testimony as to the implication of defendant by the juvenile, and (2) the absence of necessity on the part of the State for introduction of the harmful hearsay declaration to gain admissibility of the defendant's subsequent admission that he "should ought to let the kid steal the lady's pocket."
These points can be discussed in the inverse order. The State implies that it was necessary to lay a foundation for the detective's confrontation of the defendant with the juvenile's accusation in order to provide explanatory background *37 for defendant's admission about his dealings with "the kid." I believe there was no such necessity, certainly not as against the crushing effect of imparting to the jury the information that defendant had been implicated by the absent juvenile. The detective's testimony could simply have been framed in the form of an inquiry as to what the defendant's response was when advised that he was to be charged on the basis of all the information the police had about his connection with the affair. See State v. Bankston, 63 N.J. 263, 268 (1973). Proof of defendant's response as to his association with the "kid" would unquestionably have been admissible as an admission and have been fully as probative against defendant as if preceded by the prejudicial preliminary statement by the detective to defendant. Here any additional probative value of the incriminatory reference was far outweighed by its prejudicial effect. Cf. State v. Garfole, 76 N.J. 445, 456-457 (1978); see Evid. R. 4.
The inadmissibility on hearsay and constitutional grounds of an out-of-court statement by an accused co-felon implicating a defendant is unquestioned. Evid. R. 63; Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); State v. Bankston, supra, 63 N.J. at 268-269. The State's only response, with which the majority of this court agrees, is that the statement was technically not hearsay and that the prejudicial effect was cured by the court's admonition to the jury not to infer from the detective's testimony that the juvenile did in fact implicate defendant in the crime but to consider that aspect of the detective's testimony only to "judge what weight if any is to be given to * * * any response the defendant may have made to the statement." I cannot find the instruction to have been sufficiently curative to have dispelled the reasonable possibility that the admission of the objectionable statement contributed to defendant's conviction because of the jury's potential use of its incriminatory aspect as substantively probative of guilt. State v. Macon, 57 N.J. 325, 336 (1971). In this regard, the prejudice was accentuated by the prosecutor's allusion *38 in his summation to the same statement by the detective to defendant, i.e., that "somebody is implicating you in the armed robbery."
The question as to when a reviewing court will or will not find trial instructions to a jury, concerning the legitimate use of evidence which is objectionable and prejudicial in other aspects, adequate to prevent injustice, is indeed a contentious one. Concededly the presumption must ordinarily be entertained that the jury will understand and be able to respect the limitations specified in the court's instructions, as otherwise the trial process would be a most fragile instrument in the administration of justice. State v. Manley, 54 N.J. 259, 270 (1969). But the view of the United States Supreme Court, with which I agree, is that a hearsay implication of the guilt of a defendant by an alleged confederate in the crime is so laden with prejudice that, although admissible as to the declarant as a defendant, its inimical effect upon the other defendant cannot be cured by instructions to the jury. Bruton v. United States, supra, 391 U.S. at 129, 88 S.Ct. 1620, quoting the concurring opinion of Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949), to the effect that "the naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers know to be unmitigated fiction." While, for reasons noted above, I would not indulge that dictum as of universal application, I have no doubt of its accuracy when a judge tells a jury, as in the case before us, that evidence facially indicating inculpation of a defendant by an alleged co-felon, does not justify an inference by them that the co-felon did just that.
Indeed, in a closely comparable kind of setting, our Supreme Court in State v. Young, 46 N.J. 152, 157 (1965), held it dubious that an instruction to the jury could effectively protect a nonconfessing codefendant in a joint trial from the prejudice ensuing from introduction of a confession of a defendant although purportedly admitted in evidence *39 only against the latter. The court said, ibid., n. 1: "In fact many judges believe that the admission of a codefendant's confession which inculpates the defendant creates prejudice which no limiting instructions, no matter how frequently or forcefully given, can erase from the minds of jurors," citing as an example Judge Learned Hand's observations in Nash v. United States, 54 F.2d 1006, 1007 (2 Cir.1932). As a result, the Young court forbade joint trials where the State intended to use a confession of one defendant implicating a codefendant unless there could be an effective deletion of all references to the codefendant without prejudicing the confessing defendant. 46 N.J. at 158-159.
I see no substantial comfort to this defendant in the trial court having told the jury that Detective Dilkes' statement to defendant that the juvenile had implicated him might not be true as it is a police practice at times "in order to get some response from a suspect they [police] may represent something to the suspect that is not really true for the purpose of getting some response from him." The point is that there is a distinct probability that the jury would have believed that the tale of implication of defendant by the juvenile was true, whatever the court's explanation of prosecutorial tactics, in the light of the attendant incriminating circumstances given in evidence, including the apprehension of the juvenile in the criminal act. Moreover, the issue is not, as the majority seems to be concerned, pp. 30-31, as to whether it is legitimate police tactics to tell a suspect falsely that a co-suspect has implicated him, but rather whether it is permissible as a preface to proof of an admission by a defendant that the jury be told that the interrogating officer first told defendant when in custody that a co-suspect had implicated him. For all the reasons set forth above my response to that question is in the negative.
In conclusion, while I note that the State has not argued that any error in admission of the testimony in question was harmless beyond a reasonable doubt, I do not believe that it was. Although the web of circumstantial evidence against *40 defendant was strong, it was not conclusive, and the introduction of the statement of incrimination of defendant by the juvenile virtually placed the last nail in the coffin of the defense.
I would reverse, but only on this issue, and would grant a new trial.