171 N.J. Super. 173 (1979)
408 A.2d 440
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
FREDERICK S. MANN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted September 24, 1979.
Decided October 18, 1979.
*174 Before Judges SEIDMAN, MICHELS and DEVINE.
Mr. Stanley C. Van Ness, Public Advocate, attorney for appellant (Mr. Joseph C. Truncale, Springfield designated attorney, of counsel and on the brief).
Mr. John J. Degnan, Attorney General of New Jersey, attorney for respondent (Mr. Rocky L. Peterson, Deputy Attorney General, of counsel and on the letter brief).
The opinion of the court was delivered by DEVINE, J.A.D.
On July 6, 1977, at about 1:30 p.m., Mrs. Alice Sauers while returning from shopping observed a young black male near her driveway. Shortly thereafter the same man entered her kitchen armed with a barbecue fork. He choked her, knocked her to the floor, gagged her with paper napkins and had her lie prone on the floor with his foot on her back.
After demanding money the assailant took her wedding rings, cash from her pocketbook and her car keys. He escaped in her automobile, a 1973 blue Pontiac bearing license plate 2 PCE, registered in the name of Charles Sauer.
*175 On July 13, 1977, at about 1:16 a.m., Sergeant Fred Hohorst of the Bergen County Police, while on patrol, noticed a vehicle directly ahead of him as he was approaching a red traffic light. He observed the 2 PCE license plate and the four young black male occupants. When the light changed he pulled the vehicle over, and it stopped in a parking lot.
The driver, defendant Frederick Mann, left the vehicle and provided the officer with his driver's license. In response to the officer's questions defendant replied that he had borrowed the vehicle from "Charles, from Clifton." When asked why the radio was ripped out of the dashboard defendant explained that he had received the car in exactly that condition. The officer then radioed police headquarters and ascertained by way of a National Crime Information Center check that the Pontiac had been reported stolen. Defendant was then placed under arrest.
On July 19, 1977 Mrs. Sauers identified defendant at a line-up, and subsequently identified him at trial as the man who robbed her.
An indictment was entered against defendant charging him with (1) entering with intent to rob, contrary to N.J.S.A. 2A:94-1; (2) robbery, contrary to N.J.S.A. 2A:141-1; (3) robbery while armed with a barbecue fork, contrary to N.J.S.A. 2A:151-5; (4) larceny of an automobile, contrary to N.J.S.A. 2A:119-2, and (5) receiving stolen property, contrary to N.J.S.A. 2A:139-3.
Defendant was tried to a jury. At the conclusion of the State's case the trial judge granted defendant's motion to merge count 4 into count 2. Defendant was found guilty on counts 1, 2 and 3, and acquitted on count 5.
Defendant was sentenced to a minimum of seven years and a maximum of ten years on count 2. On count 3 he received a two to three-year term consecutive to count 2. Count 1 was made concurrent to counts 2 and 3 and carried a one to two-year term. The 9 to 13-year aggregate term was made consecutive to any sentence for parole violation.
*176 Initially, defendant contends that the trial judges erred in concluding that the rule in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was inapplicable to the onsight interrogation by the police officer. He argues that a "random traffic stop," insulated from the Miranda purview by State v. Macuk, 57 N.J. 1 (1970), was not involved. He asserts that, to the contrary, the stopping of the vehicle by the police officer was motivated by a suspicion that it was stolen, and defendant's freedom of action was curtailed from the moment he obeyed the officer's instruction. Accordingly, the questioning of defendant at the scene constituted a "custodial interrogation."
In order to identify the precise interrogation involved we have extracted a portion of the record. Sergeant Hohorst testified:
"Q. Did you ever determine who was the driver of that automobile?
A. After I pulled into the parking lot, I exited from the vehicle and walked over to the car and the driver of the vehicle stepped out of the vehicle and he handed me a driver's license in the name of Frederick Mann, and he also told me that it was not his car, that his car had been stolen and he handed me a Xerox copy of a police report that indicated a car reported stolen about I believe it was something like three months prior to the date when I stopped him.
I asked the driver for the registration for the vehicle and he went back into the car, into the glove compartment of the vehicle and he found what looked like a registration, and still leaning over, kind of read the registration like he had to  I don't know for what reason  either to examine if it was the proper one or whatever it was.
I couldn't determine at the time. And I asked him who the car belonged to and he said it belonged to Charles, from Clifton.
Q. Did he say this while he was inside the car looking at the registration, Officer?
A. No, after he had taken the registration, gave it to me and when I noticed that it was not the same name, that's when I asked as to who this car belonged to.
Q. And he said what?
A. That is  he had borrowed it from Charles and that he, the person, was from Clifton.

*177 Q. And the registration  the name on the registration was what?
A. Charles Sauers or Sauer, from Clifton.
Q. Dumond Avenue, in Clifton?
A. I would have to check my report.
Q. Would you check your report, please?
A. 290 Dumond Avenue, Clifton. That's correct.
........
Q. At the time you stopped this car, you didn't 
A. At the time I stopped the vehicle there was one thing I failed to mention was that the radio had been ripped out of the dash. There was still plastic glass from the dash laying on the floor and I was not  did not get any kind of  I asked for an explanation and he said that's the way it was already. I asked the driver as to how come the radio was missing.
Specifically, it is the contention of defendant that he should not have been questioned about the ownership of the vehicle, or the condition of the radio without a preliminary Miranda warning. A motion incorporating the argument was presented to the trial judge at the commencement of the trial, and denied.
Assuming, arguendo, that the stopping of the vehicle by the police officer did not fall squarely within the "random" motor vehicle investigation stop considered in State v. Macuk, supra, and State v. Lewin, 163 N.J. Super. 439 (App.Div. 1978), we are not persuaded that defendant was entitled to a Miranda warning.
As Chief Justice Warren observed in Miranda:
Our decision is not intended to hamper the traditional functions of police officers in investigating crime.... General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. [384 U.S. at 477, 86 S.Ct. at 1629, 16 L.Ed.2d at 725, citations omitted]
In Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), it was emphasized that a noncustodial situation is not converted to one in which Miranda applies merely because the questioning takes place in "coercive environment":

*178 ... Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited. [429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719]
See, also, State v. Macuk, 57 N.J. at 9 (1970); State v. Lutz, 165 N.J. Super. 278, 283-285, (App.Div. 1979); State v. Manning, 165 N.J. Super. 19, 26-28 (App.Div. 1978), aff'd after remand 166 N.J. Super. 56 (App.Div. 1979).
Guided by the comments found in the above-cited decisions, we conclude that the police officer's brief questioning of defendant at the scene of the stop did not constitute an in-custody interrogation. Defendant volunteered his driver's license, and a copy of a police report noting the theft of his own vehicle. Hence, the only potentially objectionable statements made by defendant concerned his alleged borrowing of the car from "Charles," and the reason for the missing radio. The officer's inquiries amounted to no more than a conscientious police investigation which fell far short of the "custodial" interrogation anticipated by Miranda. See, also, State v. Barnes, 54 N.J. 1, 6-7 (1969).
The denial of defendant's motion by the trial judge was correct.
In the supplemental brief filed at the direction of this court defendant now adopts the position that his arrest and conviction arose out of a "random traffic stop," invalidated by Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), which held:

*179 ... except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of [the] law, [the] stopping [of] an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. [440 U.S. at 663, 99 S.Ct. at 1401, 69 L.Ed.2d at 673]
Defendant contends that the invalidation should be applied retroactively to the stopping of his vehicle in 1977, and any evidence flowing from the concomitant investigation suppressed as being the fruit of the proscribed conduct. We disagree.
In State v. Howery, 80 N.J. 563 (1979), the Supreme Court considered the retroactivity of Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), which permits a defendant to inquire into the veracity of a search warrant affidavit, contrary to a long-established policy prohibiting such a challenge, as defined in State v. Petillo, 61 N.J. 165 (1972), cert. den. 410 U.S. 945, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973).
In reaching the conclusion that Franks should not be applied retroactively the court adopted a three-pronged test: (1) the purpose of the rule, and whether it would be furthered by a retroactive application; (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice, quoting in support State v. Nash, 64 N.J. 464, 469-470 (1974), and United States v. Peltier, 422 U.S. 531, 535, 95 S.Ct. 2313, 2316, 45 L.Ed.2d 374, 380 (1975), and noting:
The Franks rule, being a new variant of the exclusionary rule device is not one which concerns either the reliability of the verdict or the reliability of the fact-finding process at a criminal trial. [80 N.J. at 569]
In United States v. Peltier, supra, the United States Supreme Court, in declining to apply its proscription of roving border patrol searches retroactively, held:

*180 ... If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment. Admittedly this uniform treatment of roving border patrol searches by the federal judiciary was overturned by this Court's decision in Almeida-Sanchez [v. U.S., 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973)]. But in light of this history and of what we perceive to be the purpose of the exclusionary rule, we conclude that nothing in the Fourth Amendment, or in the exclusionary rule fashioned to implement it, requires that the evidence here be suppressed, even if we assume that respondent's Fourth Amendment rights were violated by the search of his car. [422 U.S. at 542, 95 S.Ct. at 2320].
The stop and interrogation involved in the case before us occurred in 1977, approximately seven years after Macuk and its numerous progeny, and approximately two years prior to Prouse. Moreover, N.J.S.A. 39:3-29, requiring a driver or operator to exhibit his driver's license and registration upon request of a motor vehicle inspector, police officer or magistrate, was viable at the time. Certainly the police officer in this case cannot be charged with knowledge that the stop and interrogation violated the Fourth Amendment. To the contrary, the "random" stop carried with it a long-established history of validity, and was not improperly motivated. Finally, the fairness of the trial is not in issue.
We view Howery and Peltier as requiring this court to apply the law as of the time of the stop and interrogation, rather than to apply Prouse retroactively.
We are aware of the opinion of this court in State v. Carpentieri, 168 N.J. Super. 589 (App.Div. 1979), certif. granted 81 N.J. 406 (1979), which held Prouse to be retroactive. We note the decision predated Howery. We respectfully disagree with the conclusion reached in Carpentieri and choose not to follow it.
Defendant asserts that the 9 to 13 years aggregate term is excessive and unduly punitive. We have carefully reviewed the record and the reasons advanced by the trial court. We find no *181 mistaken exercise of discretion. State v. Whitaker, 79 N.J. 503 (1979).
Affirmed.