585 A.2d 945

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. LINDA A. SCHREIBER, DEFENDANT–RESPONDENT.

Argued November 5, 1990—Decided February 11, 1991.

*Boris Moczula,* Deputy Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*Thomas M. Russo, III,* argued the cause for respondent (*Voorhees, Bennett & Wherry,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

The narrow issue in this appeal is whether the patient-physician privilege as enacted at *N.J.S.A.* 2A:84A–22.2 precludes the admission into evidence, at defendant's trial for driving while under the influence of alcohol, of defendant's blood test, which was voluntarily disclosed to the police by an emergency-room physician. That ultimate question, whether or not the doctor's revelations violated the patient-physician privilege, depends on our answer to the penultimate question of whether defendant's violation of the Motor Vehicles Act, more particularly *N.J.S.A.* 39:4–50, driving while under the influence of alcohol (DWI), is

"a crime or violation of the disorderly persons law[.]" *N.J.S.A.* 2A:84A–22.2.

## I

At approximately 7:00 a.m. on November 17, 1986, defendant, Linda Schreiber, driving alone, was involved in a one-car accident. Her car skidded back and forth off of and onto the roadway. Finally, it left the roadway, flipped over and came to rest upside down in a grassy area near the roadway. Ms. Schreiber was thrown from the car, sustaining serious injuries that necessitated a one-month hospital stay.

Two Hopewell Township police officers, as well as the Hopewell Borough Rescue Squad, responded to the scene. Because of Mrs. Schreiber's extensive injuries, the rescue squad rushed her to the Princeton Medical Center. The police officers, Sergeant Erdelsky and Patrolman Simonelli, therefore, were not able to speak to her at the scene. At that time, however, the officers did observe the accident scene and spoke with a person who had witnessed the car leave the road.

Ms. Schreiber, injured and unconscious, was admitted to the hospital through its emergency room, where the medical staff conducted several tests, including a blood test. Although neither police officer was present nor requested such a test, the medical staff administered it for diagnostic reasons.

On December 15, 1986, an emergency-room physician at the Princeton Medical Center called the Hopewell Police Department and revealed that the blood test showed Ms. Schreiber's blood alcohol level to be .26% at the time of her admission to the hospital. Prior to that time the police had issued defendant a summons only for failure to wear a seatbelt, contrary to *N.J.S.A.* 39:3–76.2. Based on this new information, Sergeant Erdelsky then issued Ms. Schreiber additional summonses for DWI, contrary to *N.J.S.A.* 39:4–50, and for careless driving, contrary to *N.J.S.A.* 39:4–97. The summonses were issued twenty-nine days after the accident, on the day after Ms.

Schreiber was discharged from the hospital and one day before the statute of limitations on motor vehicle violations expired.

Believing that he had to comply with *State v. Dyal,* 97 *N.J.* 229, 478 *A.*2d 390 (1984), Sergeant Erdelsky prepared an affidavit in support of his application for a *subpoena duces tecum* ordering the hospital to produce defendant's medical records. In response to the subpoena, the hospital produced the records. After a hearing the court denied Ms. Schreiber's motion to suppress the evidence contained in those records.

Subsequently, Ms. Schreiber was found guilty in municipal court of DWI and failure to wear a seatbelt. Defendant appealed her DWI conviction to the Law Division, which, after a trial *de novo,* also found her guilty of DWI. Defendant lost her license to drive for six months and was sentenced to twelve to forty-eight hours detention at an Intoxication Driver Resource Center. Miscellaneous fines and such charges likewise were imposed on Ms. Schreiber. Defendant then appealed to the Appellate Division, which reversed her conviction on the ground that the blood test should have been suppressed due to a violation of the patient-physician privilege. 240 *N.J.Super.* 507, 573 *A.*2d 942.

We granted certification, 122 *N.J.* 166, 584 *A.*2d 232 (1990), and now reverse the Appellate Division judgment and reinstate the judgment of the trial court.

II

Of privileges, it has been noted that "their effect ... is clearly inhibitive; rather than facilitating the illumination of truth, they shut out the light." E. Cleary, *McCormick on Evidence,* (3rd Ed.1984) § 72, p. 171. Nonetheless, for reasons considered important by society, witnesses are permitted to withhold relevant, often invaluable, evidence from the search for truth. *State v. Dyal, supra,* 97 *N.J.* at 237, 478 *A.*2d 390.

Because privileges have such effect, courts here and elsewhere have long construed them narrowly in an attempt to

promote, at once, the goals of the privilege and the truthseek-ing role of the courts. *See, e.g., United States v. Nixon,* 418 *U.S.* 683, 710, 94 *S.Ct.* 3090, 3108, 41 *L.Ed.*2d 1039, 1065 (1974) ("Whatever their origins, these exceptions to the demand of every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."); *State v. Dyal, supra,* 97 *N.J.* at 237, 478 *A.*2d 390 ("The inevitable effect of allowing the privilege, nonetheless, is the withholding of evidence, often of the most reliable and proba-tive kind.... [T]o the extent that the privilege is honored, it may undermine the search for truth ... [and] is restrictively construed."). Those principles give us our rule of construction for interpreting the statutory privilege of relatively recent vintage.

 The patient-physician privilege, which did not exist at common law, was added to New Jersey's legal landscape by statute in 1968. *State v. Dyal, supra,* 97 *N.J.* at 235–36, 478 *A.*2d 390. The relevant portion of that statute reads:

**Communications between physician and patient considered privileged under certain circumstances.** Except as otherwise provided in this act, a person, whether or not a party, has a privilege in a civil action or in a prosecution for a *crime or violation of the disorderly persons law or for an act of juvenile delinquency* ... [*L.* 1968, *c.* 185, § 2, eff. July 19, 1968 (now codified at *N.J.S.A.* 2A:84A–22.2) (emphasis added).]

Crimes in New Jersey are defined by the Code of Criminal Justice, *N.J.S.A.* 2C:1–1 to 2C:98–4. This court has recently reaffirmed that motor vehicle violations, including violations of a DWI statute, are not offenses under that Code. *State v. Hammond,* 118 *N.J.* 306, 318, 571 *A.*2d 942 (1990). There we held that "the provisions of the Code governing principles of liability are not applicable to" DWI violations. That has been our consistent position when presented with issues regarding applicable defenses, *ibid.;* jury charges on "lesser included" offenses before deliberations on other, *criminal* charges, *State v. Muniz,* 118 *N.J.* 319, 325, 571 *A.*2d 948 (1990), and requests for a jury trial in DWI cases, *State v. Hamm,* 121 *N.J.* 109, 577

*A*.2d 1259 (1990). Our decisions on those issues lead to our conclusion on this one.

The fact that the privilege was enacted before the Code does not change the analysis. As noted above, those recent cases merely re-affirmed the longstanding position of the New Jersey courts. In 1967, before the privilege had been enacted, *State v. Zucconi* stated that motor vehicle violations were not "criminal" offenses. 93 *N.J.Super.* 380, 384–87, 226 *A*.2d 16 (App. Div.), *aff'd*, 50 *N.J.* 361, 235 *A*.2d 193 (1967). Subsequent to the enactment of the privilege, this Court stated in 1970 in *State v. Macuk*, 57 *N.J.* 1, 9, 268 *A*.2d 1 (1970), that "motor vehicle violations are not 'crimes' in this state, but only petty offenses." Those statements, approximately contemporaneous with passage of the statutory privilege, show that the legislature did not view a DWI violation as a "crime." Consequently, it would not have prevented a disclosure like the one in this case by granting "a privilege ... in a prosecution for a crime[.]" In sum, violation of a DWI statute is not a "crime" in New Jersey.

However, the statute itself and our statements in *Macuk* raise the additional question of whether a "disorderly persons offense" includes vehicular "petty offenses" as referred to in *State v. Macuk, supra*, 57 *N.J.* at 9, 268 *A*.2d 1. In *State v. Hammond, supra*, we answered that question in the negative:

The legislative history of the Motor Vehicle Act further confirms that the Legislature did not intend to cover motor vehicle offenses under the Code. Originally, drunk driving was treated under the Disorderly Persons Act as an ordinary disorderly persons offense. *L.* 1913, *c.* 67, § 1. The Legislature, however, in 1921, transferred the offense of "operat[ing] an automobile ... while under the influence of intoxicating liquor" from the Disorderly Persons Act to Title 39, the Motor Vehicle Act. *L.* 1921, *c.* 208, § 14. That statutory change effectuated the recommendation of a Commission constituted to study the question. *Motor Vehicle and Traffic Act*, Report to Governor and Legislature, 1 (1921). The Report urged that the Motor Vehicle Act be changed to transfer "the prohibition against intoxicated driving from the Disorderly Persons Act to the Motor Vehicle Act ..." *Id.* at 14. Moreover, no subsequent statutory treatment of drunk driving violations in any way suggests a change in the legislative decision to separate motor vehicle violations from disorderly persons offenses under the state's general criminal laws.

[118 *N.J.* at 312–13, 571 *A*.2d 942.]

We also noted that disorderly persons offenses and motor vehicle violations, though both petty offenses and not crimes, are distinct. *Ibid.; see also State v. Senno*, 79 *N.J.* 216, 223, 398 *A.*2d 873 (1979) (describing petty offenses as a "generic category"). Thus, even though *Hammond* was decided in 1990, the legislative history indicated that motor vehicle violations have not been considered disorderly persons offenses since 1921.

Our interpretations of the statutory language comports with the policy underlying the privilege, the canons of construction concerning such communications, and the countervailing considerations before the court. We do not find persuasive the interpretation of the statute that finds the language "a civil action or in a prosecution for a crime or violation of the disorderly persons law or for an act of juvenile delinquency," *N.J.S.A.* 2A:84A–22.2, to be illustrative rather than exhaustive. That interpretation would require this Court to construe the statute expansively. That is not and never has been the policy of this Court toward privileges. *State v. Dyal, supra*, 97 *N.J.* at 237, 478 *A.*2d 390; *State v. Briley*, 53 *N.J.* 498, 506, 251 *A.*2d 442 (1969) (discussing the spousal privilege).

Nor do we find persuasive Ms. Schreiber's reliance on *State v. Elwell*, 132 *N.H.* 599, 567 *A.*2d 1002 (1989), a case interpreting New Hampshire's patient-physician privilege. Whatever factual similarities are present between *Elwell* and this case are irrelevant, for the New Hampshire Supreme Court was interpreting a substantially broader and different statute. The New Hampshire statute reads:

> The confidential relations and communication between a physician or surgeon licensed under provisions of this chapter and his patient are placed on the *same basis as those provided by law between attorney and client,* and, except as otherwise provided by law, no such physician or surgeon shall be required to disclose such privileged communications. Confidential relations and communications between a patient and any person working under the supervision of a physician or surgeon that are customary and necessary for diagnosis and treatment are privileged to the same extent as though those relations or communications were with such supervising physician or surgeon.
>
> *N.H. R.S.A.* 329:26 (Supp.1988) (emphasis added).

Were this New Jersey's statute, we might concur. However, it is not. In fact, one year before adopting the New Jersey version of the privilege, the legislature considered a proposal to enact a privilege for physicians mirroring New Hampshire's. Yet, it never even put it to a floor vote, *see Journal of Medical Society of N.J.*, Vol. 64, April 1967, p. 184; *see also Legislative Notes on R.S. 2A:84A–22.1 to—(confidential communications between physicians and patients)* (on file at the New Jersey State Law Library in Trenton), although the legislature did enact just such a broad privilege in the psychologist-patient setting. *See N.J.S.A.* 45:14B–28 (enacted at *L.*1966, *c.* 282, § 28). That statutory history further supports our conclusion.

### III

Because the statutory privilege does not cover DWI offenses, like the present one, we need not decide whether the statement of the doctor in this case constitutes an "objective fact[ ] known at the time of the event or discovered within a reasonable time thereafter." *State v. Dyal, supra,* 97 *N.J.* at 240, 478 *A.*2d 390. In *Dyal,* we stated that

"[a] patient's interest in the confidentiality of hospital records [should not] preclude all access to records of blood alcohol test results.. That interest can be protected adequately by requiring investigating police to establish a reasonable basis to believe that the operator was intoxicated, a showing that may be established by objective facts known at the time of the event or discovered within a reasonable time thereafter."

[*Ibid.*]

In this case, the patient's statutorily-created and -defined interest has not been infringed, and hence needs no concomitant protection.

■ Nevertheless, our decision here, although outside the legally-applicable privilege, does potentially affect the patient-physician relationship. We understand that

[p]hysicians must often elicit extremely confidential and potentially embarrassing information from patients in order to diagnose and treat a physical ailment. Patients might hesitate to communicate that information to physicians if they believed disclosure could be compelled by a court. For instance, when New York required doctors to report to a state agency the names of all patients who

were prescribed certain narcotic medications, a few patients discontinued use of the medications or began obtaining them in another state. This evidence suggests that some patients might forgo treatment rather than risk the public stigma that might follow from disclosure of medical information. [Developments in the Law—Privileged Communications, 98 *Harv.L.Rev.* 1450, 1543 (1985) (citing *Whalen v. Roe,* 429 *U.S.* 589, 595 & n. 16, 97 *S.Ct.* 869, 874 & n. 16, 51 *L.Ed.*2d 64, 70–71 & n. 16 (1977)).]

The patient-physician privilege, as enacted by the Legislature, is but one method of promoting and strengthening a relationship that is valued by society. *Id.* at 1452.

Notwithstanding recurrent concerns over the application of a testimonial privilege, we have long understood that the law should acknowledge the ethical duties imposed on physicians by their profession while the judicial system engages in the search for truth. *See generally Stempler v. Speidell,* 100 *N.J.* 368, 374–383, 495 *A.*2d 857 (1985) (discussing best method "to accord adequate recognition to the competing interests that have been identified"); *Hague v. Williams,* 37 *N.J.* 328, 336, 181 *A.*2d 345 (1962) (stating that right of confidentiality is limited by "the supervening interest of society"). However, we are not called upon to decide whether the emergency-room physician in this case violated any ethical duty imposed on him by his profession. He volunteered the information to police without any prompting or pressure. Although we can caution law-enforcement officers not to cajole hesitant hospital doctors to violate confidences absent some preceding justification, we cannot expect diligent, conscientious officers like Sergeant Erdelsky to ignore evidence voluntarily placed before them.

We have confirmed that

[t]he primary purpose behind New Jersey's drunk-driving statutes is to curb the senseless havoc and destruction caused by intoxicated drivers ... The overall scheme of these laws reflects the dominant legislative purpose to eliminate intoxicated drivers from the roadways of the State. To this end, the Legislature, working in tandem with the courts, has consistently sought to streamline the implementation of these laws and to remove the obstacles impeding the efficient and successful prosecution of those who drink and drive. [*State v. Tischio,* 107 *N.J.* 504, 512, 514, 527 *A.*2d 388 (1987).]

This important public policy can tolerate a respect for the privacy and confidentiality of communications between physi-

cians and patients so that a medical license does not deputize a doctor and force him or her to investigate independently suspected violations of Title 39. But it cannot tolerate the suppression of evidence blamelessly received by the police from an unquestionably voluntary source. *Cf. State v. Bodtmann,* 239 *N.J.Super.* 33, 43, 570 *A.*2d 1003 (App.Div.1990) ("It is questionable that the violation of the patient/physician privilege is a poisonous tree in a constitutional sense so as to bar the admission of evidence obtained by the investigating police as a result of receiving the blood alcohol results in violation of the patient/physician privilege.").

■ There is little doubt that this blamelessly-received information gave police a reasonable basis for believing Ms. Schreiber was drunk at the time of her accident. A statement by the attending physician regarding the patient's physical state or her test results provides more than adequate support for the reasonable police officer. That voluntary revelation, although delayed by twenty-nine days, was not stale. Although near the outer limit, it occurred within the one-month statute of limitations for motor-vehicle violations. We will not question here that legislative determination of when the reasonable time for investigating and identifying such violations ends.

## IV

In conclusion, we find *N.J.S.A.* 2A:84A–22.2, which defines the patient-physician privilege, is to be strictly construed and by its language does not apply to a prosecution for violation of the motor vehicle laws.

We reverse the judgment of the Appellate Division and reinstate the judgment of the trial court.

*For reversal and remandment*—Chief Justice WILENTZ and Justices GARIBALDI, CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN—7.

*For affirmance*—None.