263 N.J. Super. 98 (1993)
622 A.2d 248
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CRAIG SZEMPLE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 16, 1992.
Decided February 22, 1993.
*99 George T. Daggett argued the cause for appellant (Daggett & Kraemer, attorneys; Mr. Daggett on the brief).
Joseph Connor, Jr., Assistant Prosecutor, argued the cause for respondent (W. Michael Murphy, Jr., Morris County Prosecutor, attorney; Mr. Connor on the brief).
Before Judges J.H. COLEMAN, ARNOLD M. STEIN and CONLEY.
The opinion of the court was delivered by CONLEY, J.A.D.
During defendant's trial for murder and after the State had rested its direct case, the State moved to reopen to introduce two alleged confessions by defendant. One was contained in a letter written to defendant's wife and obtained by her father. The second was allegedly made to a "minister of visitation" during the minister's visits to defendant while he was incarcerated. Defendant objected to the use of this evidence on the grounds the former was protected by Evid.R. 28, N.J.S.A. 2A:84A-22, and the latter by Evid.R. 29, N.J.S.A. 2A:84A-23. The State's motion, however, was granted and defendant's subsequent motion for mistrial denied. On interlocutory appeal, we reversed the trial court's denial of defendant's motion for mistrial and granted leave to appeal to review the trial court's ruling that neither privilege was applicable. We now affirm.
The critical facts concerning application of Evid.R. 28 are as follows. Early in 1991, after defendant had been arrested, *100 Theresa Boyle, defendant's wife, asked her father, Michael Boyle, to help her move. Theresa had packed many of her belongings in boxes and her father helped her sort them out. During the process, he saw some folded sheets of white paper in one of the boxes. It was a letter to Theresa from defendant. Boyle "said to [himself] I don't know nothing about this guy and this looks like it's going to be something for me to look at," so he kept it. At that time he knew little about his daughter's husband except that he was in jail and accused of murder, and Boyle was worried about Theresa. He stuck the ten-page letter in his shirt to hide it from his daughter.
Later, when Boyle read the letter, he thought it was "dynamite," especially a part of page eight that read: "My first hit was an act of treachery, the ultimate deceit. Four bullets in the back, one in the neck.... I never did tell his mother what happened to him. The second I pulled the trigger, I became larger than death to all of my associates." The prosecutor presented evidence which tied the statement in the letter to the murder victim. In ruling that the letter was admissible, the trial judge concluded that the letter, although it would have been privileged under Evid.R. 28 if in Theresa's possession, lost that protection when it came into her father's possession without her consent, connivance or aid.
The facts concerning application of Evid.R. 29 are as follows. Paul Bischoff, a retired Newark firefighter, served as Minister of Visitation for the Trinity Baptist Church in Montville, having obtained a certificate of ordination to that ministry from the church. During the period between April 1991 and January 1992, in his capacity as visiting minister Bischoff visited defendant in jail about nineteen times. In October or November 1991, defendant admitted to Bischoff during one of his jail visits that he had killed "not one but three."[1] Bischoff reported *101 this admission to defendant's sister and brother-in-law, and possibly to defendant's mother. It was related to the prosecutor by a family member, and the prosecutor's office contacted Bischoff. In ruling that Bischoff's testimony was admissible, the trial judge initially found that Bischoff did not qualify for the privilege because he was not an ordained clergyperson. However, assuming the application of the privilege, the judge concluded it had been waived pursuant to Evid.R. 37, N.J.S.A. 2A:84A-29.

I.
Preliminarily, we think it important when considering the scope of various privileges to recognize that privileges preventing disclosure of relevant evidence are not favored and may often give way to a stronger public interest. State v. Briley, 53 N.J. 498, 505-06, 251 A.2d 442 (1969). This is so because such privileges "are obstacles in the path of the normal trial objective of a search for ultimate truth. They are accepted only because in the particular area concerned, they are regarded as serving a more important public interest than the need for full disclosure." Id. at 506, 251 A.2d 442. Strict adherence, moreover, to privileges "promotes the suppression of truth, [and] should be construed and applied in sensible accommodation to the aim of a just result." Ibid. Accord State v. Schreiber, 122 N.J. 579, 582-83, 585, 585 A.2d 945 (1991) ("Of privileges, it has been noted that `their effect ... is clearly inhibitive; rather than facilitating the illumination of truth, they shut out the light.'" Id. at 582, 585 A.2d 945 (citation omitted)); State v. Shahamet, 228 N.J. Super. 340, 344, 549 A.2d 884 (App.Div. 1988). See Evid.R. 7 ("Except as otherwise provided in these rules or by other law of this State ... (d) *102 no person has a privilege to refuse to disclose any matter or to produce any object or writing....").
Thus in Schreiber the scope of the physician-patient privilege "in a civil action or in a prosecution for a crime or violation of the disorderly persons law or for an act of juvenile delinquency," N.J.S.A. 2A:84A-22.2, was strictly limited to its express terms and, accordingly, held inapplicable to the admission of hospital blood test results conducted solely for diagnostic reasons in a DWI municipal court proceeding. Schreiber, 122 N.J. at 588, 585 A.2d 945. Similarly, in Lazorick v. Brown, 195 N.J. Super. 444, 456, 480 A.2d 223 (App.Div. 1984), the patient-physician privilege was held not to preclude defendants from interviewing plaintiff's treating physician in a medical malpractice trial. Accord Kurdek v. West Orange Bd. of Educ., 222 N.J. Super. 218, 226, 536 A.2d 332 (Law Div. 1987). And in In re Murtha, 115 N.J. Super. 380, 387, 279 A.2d 889 (App.Div.), certif. denied, 59 N.J. 239, 281 A.2d 278 (1971), the priest-penitent privilege was held inapplicable to a teaching nun. But see In re Schuman, 114 N.J. 14, 20-21, 552 A.2d 602 (1989), where the court recognized the "public's right to everyone's evidence," but determined the newsperson's privilege was more significant, preventing the State from obtaining from a reporter admissions made to him by a defendant in a murder trial; State v. J.G., 261 N.J. Super. 409, 619 A.2d 232 (App.Div. 1993) (victim-counselor privilege encompasses both direct and secondary victims of violence and mistaken release of victims' files by counselor does not constitute a waiver).

II.
Commonly referred to as the marital communications privilege, Evid.R. 28, N.J.S.A. 2A:84A-22, prevents disclosure by a spouse of confidential communications made during marriage except under certain circumstances. At the time the trial judge ruled on its inapplicability here, Evid.R. 28, N.J.S.A. 2A:84A-22, provided:

*103 No person shall disclose any communication made in confidence between such person and his or her spouse unless both shall consent to the disclosure or unless the communication is relevant to an issue in an action between them or in a criminal action or proceeding coming within Rule 23(2). When a spouse is incompetent or deceased, consent to the disclosure may be given for such spouse by the guardian, executor or administrator. The requirement for consent shall not terminate with divorce or separation. A communication between spouses while living separate and apart under a divorce from bed and board shall not be a privileged communication.

[See also Evid.R. 23; N.J.S.A. 2A:84A-17].
As amended by Act of November 17, 1992, L. 1992, c. 142, Evid.R. 28, N.J.S.A. 2A:84A-22, now provides that the disclosure shall not be made:
unless both shall consent to the disclosure or unless the communication is relevant to an issue in an action between them or in a criminal action in or proceeding in which either spouse consents to the disclosure, or in a criminal action or proceeding coming within Rule 23(2)....

[Emphasis added].
The amendment similarly narrows the scope of spousal privilege in Evid.R. 23, N.J.S.A. 2A:84A-17. Thus where previously a defendant spouse in a criminal proceeding could prevent disclosure of relevant evidence by simply not consenting, that unilateral privilege has been removed. Consent of both spouses is no longer required. Effective immediately, the act specifically provides for application "to all criminal actions regardless of the date on which the offense was committed or the action initiated." Act of November 17, 1992, L. 1992, c. 142. See R.S. v. Knighton, 125 N.J. 79, 97, 592 A.2d 1157 (1991).
We view these amendments to both the spousal privilege and the marital communication privilege as significantly limiting their preclusive effect. Although not directly applicable to this appeal, since the disclosure occurred by way of a third party and we do not know whether defendant's wife would now voluntarily disclose the content of the letter, we think the amendments substantially remove the basis of defendant's argument on appeal. In this respect counsel argues that the "threshold question in determining this issue ... is whether the *104 wife was a willing participant in the transfer of the letter from wife to father.... If the information becomes available to Mr. Boyle through the betrayal or connivance of Mrs. Szemple, to whom the message was directed, the privilege will not be lost." He further asserts: "Mrs. Szemple cannot waive the privilege by either giving the letter to her father or placing it in a position where he comes upon it. Once the communication is completed to the wife it becomes a privileged communication...."
In so arguing, defendant relies primarily upon the comment contained in the 1967 Annotations prepared by the Rules of Evidence Study Commission of the New Jersey Legislature that "once privileged, always privileged." Biunno, N.J.Rules of Evidence, explanation to Evid.R. 28 (1967). This is no longer correct; the communication may now be disclosed by the receiving spouse without restriction and thus it is no longer so that the communication is "once privileged, always privileged."
In any event, we think the trial judge properly concluded the privilege did not apply. There was no evidence presented that would in any way have suggested that Boyle obtained the letter through any involvement of defendant's wife. The undisputed testimony was that he found it in some boxes while helping her to move and removed it from the house by hiding it in his shirt. Since there was nothing to suggest the letter was in some way disclosed by defendant's wife, Evid.R. 28, N.J.S.A. 2A:84A-22, which directs that "[n]o person [spouse] shall disclose," does not by its express terms apply. Thus we have previously held that the privilege does not prohibit disclosure by third persons who may overhear a spousal conversation or see a document intended to be confidential. See State v. Sidoti, 134 N.J. Super. 426, 430-31, 341 A.2d 670 (App.Div. 1975) ("It is generally held that a third person overhearing a confidential communication between a husband and wife may testify as to it." Id. at 430, 341 A.2d 670). See also State v. Young, 97 N.J.L. 501, 505, 117 A. 713 (E. & A. 1922) ("A letter ... *105 written confidentially by a husband and to a wife, is admissible against the husband when brought into court by a third party," quoting Wharton's Criminal Evidence § 398 (10th ed. 1912) and citing Commonwealth v. Wakelin, 230 Mass. 567, 120 N.E. 209, 212 (1918)).
The view that the marital communication privilege does not apply to a written communication that has come into the possession of a third party is the majority view. The general rule is that if written communications "were obtained surreptitiously or otherwise without the addressee's consent, the privilege should cease." 8 Wigmore on Evidence § 2339, at 668 (McNaughton rev. 1961). See 1 McCormick on Evidence § 82, at 302-04 (Strong ed., 4th ed. 1992); C.J. Miller, Annotation, Applicability of Marital Privilege to Written Communications Between Spouses Inadvertently Obtained by Third Person, 32 A.L.R. 4th 1177-87 (1984) (collecting cases). See also Young, 97 N.J.L. at 505, 117 A. 713.
For example, in Zimmerman v. State, 750 S.W.2d 194, 197 (Tex. Crim. App. 1988), incriminating letters written by defendant husband were found by his mother-in-law in her daughter's dresser drawer, were surreptitiously read, and were obtained without the recipient's knowledge or consent. The Texas court declined to follow an earlier Texas rule that the privilege accorded such a document could not be defeated by a change of hands, whatever the circumstances. Id. at 200. Rather, it held that where the change of hands is inadvertent and without the consent or connivance of the addressee spouse, the third party may testify to the communication. Ibid. See State v. Myers, 230 Kan. 697, 640 P.2d 1245, 1248-49 (1982).
Courts that have denied loss of the privilege, no matter what the circumstances, have viewed the privilege as attached to the document. Miller, supra, Applicability of Marital Privileges, 32 A.L.R. 4th at 1180-84 (citing e.g., McKie v. State, 165 Ga. 210, 140 S.E. 625 (1927) (letters written by defendant wife to her husband and retrieved from his safety deposit box after his *106 death by his administrator held absolutely privileged)). That is not the rule in New Jersey. Young, 97 N.J.L. at 505, 117 A. 713. Moreover it is a view that is not consistent with our traditional approach to privileges, including the spousal/marital communications privilege. Briley, 53 N.J. at 509, 251 A.2d 442 ("[C]onsistent with the quest for truth and with present-day standards of achieving justice" the "anachronistic" restraint of the spousal privilege should not apply to preclude the wife from testifying against defendant husband in criminal trial involving not only an assault against her, but crimes against third parties as well.). But see State v. J.G., supra.
We, thus, conclude that under the circumstances here, the spousal privilege does not apply to defendant's letter.

III.
Referred to as the priest-penitent privilege, Evid.R. 29, N.J.S.A. 2A:84A-23, provides:
Subject to Rule 37, a clergyman, minister or other person or practitioner authorized to perform similar functions, of any religion shall not be allowed or compelled to disclose a confession or other confidential communication made to him in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes, nor shall he be compelled to disclose the confidential relations and communications between and among him and individuals, couples, families or groups with respect to the exercise of his professional counselling role.
The critical issue is whether this privilege is held by the clergyperson alone who may, therefore, alone waive it pursuant to Evid.R. 37, N.J.S.A. 2A:84A-29,[2] or whether it is as well held *107 by the person who has made the confidential communication. If the holder of the privilege is both the clergyperson and the penitent, then Bischoff may not testify without defendant's consent.[3]
The short answer is that the express language of Evid.R. 29, N.J.S.A. 2A:84A-23, does not identify the penitent as the holder of the privilege. Although defendant points to the use of the term "allowed" as well as "compelled," we do not view those words as clearly pertaining to the penitent. It may as well refer to the court and/or State "allowing" a clergyperson to breach his or her vow of confidentiality by considering such person a competent witness to disclose a confidential communication. Moreover, when viewed within the context of the historical development of the privilege in this State and that of other states, we think it plain the privilege is that of the clergyperson as the rule presently exists.
The priest-penitent privilege was not recognized at common law and did not exist in this State until 1947. State v. Morehous, 97 N.J.L. 285, 295, 117 A. 296 (E. & A. 1922). By Act of June 20, 1947, L. 1947, c. 324 the Legislature enacted N.J.S. 2A:81-9 which provided:
A clergyman, or other minister of any religion, shall not be allowed or compelled to disclose in any court, or to any public officer, a confession made to him in his professional character, or as a spiritual advisor, or as a spiritual advisor in the course of discipline enjoined by the rules or practice of the religious body to which he belongs or of the religion which he professes.
In the 1950's a revision of the rules of evidence then existing in New Jersey was considered, first by the Committee on the Revision of the Law of Evidence (Jacobs Committee), appointed by the Supreme Court in 1954, and then by the Commission to *108 Study the Improvement of the Law of Evidence (Bigelow Commission), appointed by the Legislature (J.Res. 15, 179th Leg., 1955 N.J. Laws 1026).
The Jacobs Committee and Bigelow Commission studied a reform of New Jersey's rules of evidence within the context of considerable evaluation and revision during the 1920's and 1930's of rules of evidence nationwide. In the early 1940's, the American Law Institute adopted the Model Code of Evidence. See generally Mason Ladd, A Modern Code of Evidence, in Model Code of Evidence 329-55 (A.L.I. 1942). Though referred to as a better approach to the "irrational" rules of evidence that then existed in New Jersey, In re Petagno, 24 N.J. Misc. 279, 286, 48 A.2d 909 (Ch. 1946); Robertson v. Hackensack Trust Co., 1 N.J. 304, 320, 63 A.2d 515 (1949) (Vanderbilt, C.J., concurring), the Model Code was not universally adopted and never officially adopted in New Jersey.
In 1949 the American Law Institute referred the Model Code of Evidence to the National Conference of Commissioners on Uniform State Laws to be "modified in such respects as will express a common ground of acceptability in the jurisdictions and by the tribunals which the rules are expected to serve." Uniform Rules of Evidence, Preface, at 161 (1953). The Uniform Rules of Evidence were adopted by the National Conference and the American Bar Association in 1953. They became a base for the Jacobs Committee's report. See generally Report of the Committee on the Revision on the Law of Evidence to the New Jersey Supreme Court v-x (1955) (Jacobs Committee Report).
Critical to the Committee's consideration of the priest-penitent privilege, the pertinent Uniform Rule of Evidence, Rule 29, provided:
(1) As used in this rule, (a) "priest" means a priest, clergyman, minister of the gospel or other officer of a church or of a religious denomination or organization, who in the course of its discipline or practice is authorized or accustomed to hear, and has a duty to keep secret, penitential communications made by members of his church, denomination or organization; (b) "penitent" *109 means a member of a church or religious denomination or organization who has made a penitential communication to a priest thereof; (c) "penitential communication" means a confession of culpable conduct made secretly and in confidence by a penitent to a priest in the course of discipline or practice of the church or religious denomination or organization of which the penitent is a member.
(2) A person, whether or not a party, has a privilege to refuse to disclose, and to prevent a witness from disclosing a communication if he claims the privilege and the judge finds that (a) the communication was a penitential communication and (b) the witness is the penitent or the priest, and (c) the claimant is the penitent, or the priest making the claim on behalf of an absent penitent.
The Drafters' Comment to the Uniform Rule states in part: "[t]his rule permits either priest, broadly defined, or penitent to claim the privilege." Jacobs Committee Report, at 76.
The Committee recommended that the Uniform Rule be rejected and that N.J.S. 2A:81-9 be adopted verbatim as a court rule. The Committee Annotations expressly recognized that one of the differences between the Uniform Rule and the then existing statute was that "[u]nder the rule the privilege belongs to the penitent, and he can waive it by a partial disclosure to any one, or waive it in other ways, thereby compelling the priest to testify.... Under the rule the penitent has a privilege to refuse to disclose his confession whereas under the statute he has no privilege at all." Jacobs Committee Report, at 77. The Committee thus understood the statute, unlike the broader approach of the Uniform Rule, to confer the privilege upon the priest and not the penitent. Since the privilege was that of the priest under the statute, it did not, unlike the Uniform Rule, confer upon anyone else the right to waive the privilege or consent to disclosure.
The Uniform Rule was rejected as well by the Bigelow Commission. It recommended the following:
Subject to Rule 37, a clergyman, or other minister of any religion, shall not be allowed or compelled to disclose in court, or to a public officer, a confession or other confidential communication made to him in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes.
[Report of the Commission to Study the Improvement of the Law of Evidence 38 (1956) (Bigelow Commission Report)].
*110 Enacted by the Legislature as N.J.S.A. 2A:84A-23 and adopted by the Supreme Court as Evid.R. 29, the only change made was to broaden the category of holders to encompass "other person or practitioner authorized to perform similar functions." Thus N.J.S. 2A:81-9 was retained with the changes being the reference to the waiver provisions of Evid.R. 37, the expansion of the holders and a corresponding expansion of what communications should be privileged from "confessions" to, additionally, "other confidential communications."[4] Significantly, while the categories of holders was broadened, the penitent was not added. In proposing these limited changes, the Bigelow Commission commented:
This Commission has adopted the Court Committee Draft to a large extent. The Court Committee recommended adoption of N.J.S. 2A:81-9 verbatim. This Commission had added confidential communications, which might not qualify as confessions but which should be privileged.

[Bigelow Commission Report, at 38].
No reference was made to the reference to Evid.R. 37.
Facially then, N.J.S.A. 2A:84A:23 and Evid.R. 29 do not confer the privilege upon the penitent.[5] We recognize that the *111 privilege as adopted in 1960 includes a specific reference to waiver pursuant to Evid.R. 37.[6]Evid.R. 37, however, confers upon a person the right to waive "his right or privilege" to refuse to disclose or prevent another from disclosing privileged matter while that person is "holder thereof." Simply put, the penitent is not a holder of the privilege under Evid.R. 29. The right to waive pursuant to Evid.R. 37, then, belongs to "a clergyman, minister or other person or practitioner authorized to perform similar functions." Defendant is not such a person. *112 As we have previously noted, expansive construction of privileges "is not and never has been" encouraged by the Supreme Court. Schreiber, 122 N.J. at 585, 585 A.2d 945. It is only through such construction that we could endow the penitent as a holder of the privilege and, thus, with the right to preclude disclosure. We decline to do so. Cf. In re Murtha, 115 N.J. Super. at 386, 279 A.2d 889 (narrowly construing "a clergyman, minister or other person a practitioner authorized to perform similar functions" not to encompass a teaching nun to whom one of her students had confessed a crime and in dicta recognizing that the holder of the privilege was the clergyperson and thus that it could be waived by that person).
Examination of other states' priest-penitent privilege is instructive. Almost every jurisdiction recognizes the privilege in some form, usually by statute.[7] The various forms the privilege *113 has taken differs from state to state. Alaska, Arkansas, Delaware, Florida, Hawaii, Kansas, Maine, Mississippi, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas, Wisconsin and the Virgin Islands have followed the approach in the Uniform Rule of conferring the privilege upon the penitent and according to the clergyperson the right to claim the privilege "on behalf of the person." Arizona, Colorado, Idaho, Louisiana, Massachusetts, Minnesota, Montana, Nevada, Oregon, Pennsylvania, Rhode Island, Washington, West Virginia and the District of Columbia prohibit disclosure by the clergyperson "without the consent" of the penitent. Similarly, Connecticut, Iowa, Kentucky, New Hampshire, New York, North Carolina, South Carolina and Tennessee prohibit disclosure by the clergyperson unless the penitent "waives" the privilege. Utah has by statute provided for nondisclosure unless consented to by the penitent, and by court rule has adopted the Uniform Rule conferring the privilege upon the penitent and permitting the clergyperson to claim on the penitent's behalf. Alabama, California and Puerto Rico confer the privilege on both the clergyperson and the penitent. Ohio confers the privilege upon the clergyperson but provides for disclosure upon consent of the penitent except when to do so would be in violation of the clergyperson's religious tenets.[8]
On the other hand, Georgia, Illinois, Indiana, Maryland, Michigan, Missouri, Vermont, Virginia and Wyoming confer the privilege solely upon the clergyperson. None provide for disclosure or nondisclosure at the behest of the penitent either by *114 requiring the penitent's consent, permitting a waiver by the penitent or by expressly making the penitent a holder. See generally, Mitchell, supra, at 755-60.
Where a state has expressly provided for the penitent's consent, such as Arizona and New York, it has been held the privilege belongs to the penitent. See Church of Jesus Christ of Latter-Day Saints v. Superior Court of Arizona, 159 Ariz. 24, 764 P.2d 759, 763 (Ct.App. 1988); De'udy v. De'udy, 130 Misc.2d 168, 495 N.Y.S.2d 616, 619 (Sup.Ct. 1985). On the other hand, both Virginia's and Missouri's statutes, which do not refer to the penitent,[9] have been construed to confer the privilege solely upon the clergyperson. Seidman v. Fishburne-Hudgins Educ. Found., Inc., 724 F.2d 413, 415-16 (4th Cir.1984) (construing the Virginia statute); Eckmann v. Board of Educ. of Hawthorn School District No. 17, 106 F.R.D. 70, 72-73 (E.D.Mo. 1985) (construing the Missouri statute).
In construing the "plain meaning" of Virginia's statute as granting the privilege only to the clergyperson and not the penitent, the court of appeals in Seidman said:

*115 The priest-penitent or clergyman-communicant privilege has no firm foundation in common law. See 8 Wigmore, Evidence § 2394 (McNaughton rev. 1961). The privilege, in modern practice, traces its existence to state statute or, in very rare cases, to state decisional law, id. § 2395, and is generally acknowledged to offer very narrow protection to the claiming witness. See, e.g., Reese, Confidential Communications to the Clergy, 24 Ohio St.L.J. 1 (1963). Statutes creating the privilege vary, but generally are designed to safeguard the clergyman's status as a secure repository for the confessant's confidences. Id. Most penitent-priest statutes have a common feature: they explicitly prohibit the clergyman from disclosing the contents of a confidential communication "without the consent of the person making the communication," Ore.Evid.Code, Rule 506 (1981); In re Williams, 269 N.C. 68, 152 S.E.2d 317, 324 (1967); see also Reese, Confidential Communications to the Clergy, supra. Significantly, the Virginia statute contains no such prohibition; it simply says that "no regular minister, priest, rabbi or accredited practitioner .. . shall be required to disclose any information" entrusted to him in a confidential conversation. This language plainly invests the priest with the privilege and leaves it to his conscience to decide when disclosure is appropriate. The priest in the present case did not invoke the privilege, but testified freely in a pretrial deposition about his conversation with Mrs. Seidman. Since the privilege was his alone to claim, Mrs. Seidman has no standing to object to the introduction of the priest's deposition into evidence or its use during cross-examination.
[Seidman, 724 F.2d at 415-16, footnote omitted].
In so holding, the court further observed "[t]his interpretation... is further buttressed by referring to other provisions of the Virginia Code relating to testimonial privileges.... The Virginia legislature included provisions in these statutes which allow communicants to require testimony concerning confidential disclosures to doctors or psychologists [by consent]. The Legislature's omission of a similar provision from the priest-penitent statute strongly indicates that the clergyman's privilege cannot be affected by the communicant." Id. at 416 n. 2.
We think this analysis is apposite to New Jersey's statute and rule. Unlike the majority of states and unlike the Uniform Rule, New Jersey's statute and rule contains no express provision for consent or waiver by the penitent. Where the Legislature and the Supreme Court intended to confer the right to consent to disclosure or waive a privilege upon a particular person, they have done so expressly. See Evid.R. 23, N.J.S.A. 2A:84A-17 (spousal privilege); Evid.R. 26, N.J.S.A. 2A:84A-20 (lawyer-client privilege); N.J.S.A. 2A:84A-22.15 (victim counselor's *116 privilege); Evid.R. 28, N.J.S.A. 2A:84A-22 (marital privilege). Where the privilege is conferred upon the confidantor, it has been done so expressly. See N.J.S.A. 2A:84A-22.1 to -22.7 (patient-physician privilege). It has not done so with respect to Evid.R. 29.
Based, then, upon the plain language of Evid.R. 29, N.J.S.A. 2A:84A-23, its historical development, and consideration of the differing forms and construction of other states' priest-penitent privilege, we conclude the priest-penitent privilege in New Jersey is that of the clergyperson and related holders and that waiver thereof may be effectuated by these holders. We, thus, affirm the trial judge's conclusion that the privilege could be waived by Bischoff.[10]
The trial judge's ruling that neither Evid.R. 23, N.J.S.A. 2A:84A-17, nor Evid.R. 29, N.J.S.A. 2A:84A-23, preclude disclosure of defendant's letter and communications to Bischoff are affirmed. The matter is remanded for further proceedings.
ARNOLD M. STEIN, J.A.D., dissenting.
Craig Szemple sent his wife a letter in which he informed her, in confidence and with obvious satisfaction, that he had killed the man for whose murder he was awaiting trial. He also confided to a minister that he had killed not just one, but three people. Szemple's father-in-law stole the letter from a carton containing his daughter's personal belongings, read it without his daughter's knowledge and eventually reported its contents to a lawyer, then to the police. The minister first told members of Szemple's family about the triple-murder confession, then reported the confession to the police.
Those who seek and sometimes obtain the benefit of testimonial or confidential communication privileges are usually not *117 nice people. They are frequently murderers, sex offenders, robbers and insurance cheats. But we do not restrict the protection of constitutional and statutory rights to those whom we would invite to our table as dinner companions.
I would exclude the contents of the purloined letter from evidence because it is protected by the spousal privilege against disclosure of confidential communications. I would also bar the testimony of the minister to whom Szemple gave incriminating statements because I believe that both the declarant and the clergy member are holders of the priest-penitent privilege.

I. The Priest-Penitent Privilege.

A lot of people will be surprised by the majority's holding that the clergy member is the exclusive possessor of the priest-penitent privilege. It will surely come as news to many that matters confided in private to a clergy member have all the security of things said to the bartender at the local corner tavern.
I doubt that people who confess such things as criminal conduct or marital infidelity expect that the clergy-recipient can, at his or her whim, reveal the confidence to others: police, family members, for that matter anyone to whom the clergy member desires.
The priest-penitent privilege exists to accommodate the need for confidence and trust in clergy-penitent relationships. As the United States Supreme Court pointed out in Trammel v. United States, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980):
The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return.
[445 U.S. at 51, 100 S.Ct. at 913, 63 L.Ed.2d at 195.]
That is the popular notion of the purpose and scope of the privilege. It is designed to protect and preserve the confidential relationship between clergy and penitent. It is, I submit, a *118 privilege afforded in plain language to both the declarant and clergy member by our New Jersey priest-penitent rule:
Subject to Rule 37, a clergyman, minister or other person or practitioner authorized to perform similar functions, of any religion shall not be allowed or compelled to disclose a confession or other confidential communication made to him in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes, nor shall he be compelled to disclose the confidential relations and communications between and among him and individuals, couples, families or groups with respect to the exercise of his professional counselling role.

[N.J.S.A. 2A:84A-23, Evid.R. 29.]
That language is straightforward. It can only mean that the clergy member cannot be compelled to reveal the confessions of the penitent, or be allowed to reveal those confidences without waiver of the privilege by the penitent pursuant to N.J.S.A. 2A:84A-29, Evid.R. 37. I dispute the majority's view that the word "compel" takes its plain meaning, but "allow" requires interpretation.
The majority says that the use of the word "allow"
may as well refer to the court and/or State "allowing" a clergyperson to breach his or her vow of confidentiality by considering such person a competent witness to disclose a confidential communication.

[Ante at 107, 622 A.2d at 252.]
The majority suggests that "allow" might be jurisdictional, conferring statutory authority upon the State or a court to permit testimony by the privilege holder. I see no reason for the State or a court "allowing" testimony by a privilege holder who voluntarily surrenders that privilege, because except as provided by the Rules of Evidence or by statute, every person is qualified to be a witness. Evid.R. 7(a). The majority's reasoning provides a long explanation for the use of "allowed," where its plain meaning is to prohibit testimony by a clergy member about confidential matters without the approval of the penitent.
*119 There is no need to look further than the plain language of the statute/rule setting forth the priest-penitent privilege. Town of Morristown v. Woman's Club of Morristown, 124 N.J. 605, 610, 592 A.2d 216 (1991). For reasons I have already given, I urge that the privilege plainly belongs to both the clergy member and the penitent.
Moreover, I dispute the majority's analysis of the historical development of the priest-penitent privilege to support the contention that the clergy members are the exclusive holders of the privilege. I find nothing to support that proposition in either the 1955 Jacobs Committee report or in the 1956 Bigelow Commission report, which substantially adopted the Jacobs Committee's recommendations.
The Jacobs Committee report recommended against adopting proposed Uniform Rule 29 because it concluded that that provision reposed the privilege solely in the penitent, thereby compelling the clergy member to testify at the bidding of the penitent, presumably even in violation of the clergy member's wishes or religious beliefs. New Jersey Comm. on the Revision of the Law of Evidence, Report of the Comm. on the Revision of the Law of Evidence to the Supreme Court of N.J. 77 (1955). The Committee recommended continuation of the priest-penitent privilege set forth in N.J.S.A. 2A:81-9, the statute in effect when the Committee's report was filed:
A Clergymen, or the minister of any religion, shall not be allowed or compelled to disclose in any court, or to any public officer, a confession made to him in his professional character, or as a spiritual advisor, or as a spiritual advisor in the course of discipline enjoined by the rules or practice of the religious body to which he belongs or of the religion which he professes.

[Id. at 76.]
That statute, with little substantive change, was incorporated in our Rules of Evidence as N.J.S.A. 2A:84A-23, Evid.R. 29. The phrase "compel or allow" has been part of our priest-penitent privilege rule as far back as the adoption of N.J.S.A. 2A:81-9 in 1947. It confirmed a dual possession of the privilege, *120 a joint status which remains in the language of our present priest-penitent rule.
The majority's historical analysis does not account for the Legislature's decision to expand confidentiality to situations where the clergy member acts as a family counselor. N.J.S.A. 2A:84A-23, Evid.R. 29, as amended by L. 1981, c. 303, § 2. The clergy member is required to keep secret not only the communication itself but the very existence of confidential relations between clergy and family counselees. Biunno, Current N.J. Rules of Evidence, Comment 2 on Evid.R. 29 (1993). The privilege against disclosure is as least as broad as those afforded others in need of family counseling such as patients of psychologists, N.J.S.A. 45:14B-28, and clients of marriage counselors, N.J.S.A. 45:8B-29. The legislative purpose is doubtless to afford nondisclosure to all recipients of family counseling, including those who confide in the clergy. It is unrealistic to assume that the privilege of confidentiality exists for persons who seek comfort from clergy members acting in the role of family counselors, but that mandatory confidentiality is unavailable to those who share secrets in confidence with the same clergy members performing the function of spiritual advisors.
All fifty states now recognize the priest-penitent privilege. Some states make the penitent the exclusive holder of the privilege. Other states confer the privilege upon both the clergy member and the penitent. Only nine states make the clergy member the sole repository of the privilege. Ante at 112-115, 622 A.2d at 255-257. We should not torture the language of our priest-penitent rule to place us with the small minority of states which confer the status of potential informant on a clergy member who is sought out by the confessor as a source of spiritual guidance and trust.
Finally, I attach no significance to the non-inclusion in Evid.R. 29 of a specific provision for express consent or waiver by the penitent. The statutory priest-penitent privilege has been around in substantially similar form for over thirty-five *121 years. Except possibly for some dicta in In re Murtha, 115 N.J. Super. 380, 386, 279 A.2d 889 (App.Div.), certif. denied, 59 N.J. 239, 281 A.2d 278 (1971), until today no case has even suggested that the penitent had no right to invoke the privilege. A specific provision was unnecessary. The language of our priest-penitent rule as written affords dual privilege to clergy member and penitent.

II. The Marital Communication Privilege

This case is not about eavesdropping on a conversation between a husband and wife pursuant to a lawfully obtained order permitting wiretapping, such as in State v. Sidoti, 134 N.J. Super. 426, 430-31, 341 A.2d 670 (App.Div. 1975).
Nor does it involve the contents of a letter dictated by a husband to a third person for delivery to the wife, as in State v. Young, 97 N.J.L. 501, 504-05, 117 A. 713 (E. & A. 1922). There the Court of Errors and Appeals held that "[t]o commit the communication to a third person to be transmitted to the wife, whether orally or in writing, destroys the element of confidence...." Id. at 505, 117 A. 713. And it does not involve the negligent abandonment of a confidential document by the receiving spouse and its discovery by a third person, as in State v. Myers, 230 Kan. 697, 700-03, 640 P.2d 1245, 1248-49 (1982). There the incriminating document was found under a mattress three months after the wife moved away. The Kansas Supreme Court permitted the third party discoverer of the document to testify as to its contents, holding:
[W]here a written confidential communication between husband and wife falls into the hands of a third party inadvertently and without the consent or connivance of the addressee-spouse, the third party should be permitted to testify as to the communication.

[Id. 640 P.2d at 1248.]
Thomas Boyle's acquisition of the letter addressed to his daughter was not accidental. The letter was not lying about in some place where a casual observer could see it, pick it up and *122 read it. It was not left behind for inevitable discovery. Boyle surreptitiously appropriated the letter. The contents of the documents were unquestionably confidential when the document was received by Szemple's wife. Boyle's surreptitious liberation of the letter did not render the privilege unavailable to Szemple, the letter's author.
The majority relies on Zimmerman v. State, 750 S.W.2d 194 (Tex. Crim. App. 1988), a case with similar, although hardly identical facts. While awaiting trial for murder, defendant wrote his wife a letter from jail, confessing that he stabbed and killed the victim. Defendant's letters, which were kept in his wife's dresser drawer, were secretly read by her mother. Id. at 197. The Texas court, relying on State v. Myers, supra, ruled that the mother could testify as to the letter's contents because it was obtained "inadvertently." 750 S.W.2d at 200-01. This was a misapplication of Myers. "Inadvertent" means heedless, negligent, inattentive or unintentional. Webster's Third New International Dictionary 1140 (1981). The letter in Zimmerman and the letter in this case came into the hands of the third party not through serendipity but as a result of snooping in a place of privacy.
Moreover, Zimmerman is factually distinguishable because defendant's letter was not intended to be a private communication. The letter concluded: "Don't hide this letter because the lawyers and doctors are going to know it all. I'm going to tell them everything." Zimmerman, 750 S.W.2d at 201.
I recognize that the spousal testimony and confidential communications privileges are regarded by our courts with disfavor because they have a potential to suppress the truth. State v. Briley, 53 N.J. 498, 505-06, 251 A.2d 442 (1969). Nevertheless, these legislatively-enacted and court-approved privileges exist because "they are regarded as serving a more important public interest than the need for full disclosure." Id. at 506, 251 A.2d 442. Whether we like them or not, see State v. Ospina, 239 N.J. Super. 645, 649-52, 571 A.2d 1373 (App.Div.), certif. denied, *123 127 N.J. 321, 604 A.2d 597 (1990), the marital privileges remain. When these privileges were recently considered by the Legislature, the decision was to dilute not to abolish them. Either spouse may now testify against the other in a criminal proceeding, N.J.S.A. 2A:84A-17, Evid.R. 23(2), and either spouse may consent to the disclosure of a confidential communication, N.J.S.A. 2A:84A-22, Evid.R. 28, both amended by L. 1992, c. 142, eff. November 17, 1992. We cannot ignore the existence of the interspousal confidential communication privilege simply because its application might produce a distasteful result.
In State v. J.G., 261 N.J. Super. 409, 413, 619 A.2d 232 (App.Div. 1993), we held that inadvertent disclosure of the confidential contents of a Family Service file did not constitute a waiver of the victim-counsellor privilege, N.J.S.A. 2A:84A-22.15. We recognized the strong public policy favoring confidentiality between victim and counsellor. Id. at 417-18, 619 A.2d 232. We also questioned whether the attorney-client privilege could be waived by inadvertent disclosure. Id. at 419-20, 619 A.2d 232. Perhaps the public policy protecting confidential communications between spouses is not so strong as those protecting the victim-counsellor and attorney-client privileges so as to require protection against inadvertent disclosure. That case is not before us. Interspousal communications made in confidence do require protection from disclosure of contents obtained by invading the recipient's private belongings.
NOTES
[1] It is apparent from the transcript of Bischoff's Evid.R. 8 hearing and his trial testimony that there was some difficulty in relating this confession to the actual murder for which defendant was being tried. We express no view as to whether on retrial a Evid.R. 4 application would be successful. Moreover, the difficulties encountered during the first trial in limiting Bischoff to the one murder confession should also be considered.
[2] Evid.R. 37, N.J.S.A. 2A:84A-29, provides in part:

A person waives his right or privilege to refuse to disclose or prevent another from disclosing a specified matter if he or any other person while the holder thereof has ... (b) without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone.
There is no question here but that Bischoff effectively waived the privilege. The issue is whether he could do so without the consent of defendant.
[3] The State does not contend that factually Bischoff as an ordained "visiting minister" was not "a clergyman, minister or other person or practitioner authorized to perform similar functions, of any religion...." Although the trial judge found that he was not, neither parties have raised or briefed that issue here. We thus do not address it. We assume, without deciding, that Bischoff falls within the category of clergyperson covered by the rule.
[4] In 1981 the statute and rule were amended to add at the end "nor shall he be compelled to disclose the confidential relations and communications between and among him and individuals, couples, families or groups with respect to the exercise of his professional counseling role." Act of November 11, 1981, L. 1981, c. 303, § 2.
[5] The rejection of the contrary approach of the Uniform Rule may have been prompted by a concern over the resulting ability of a penitent to manipulated his or her power of claiming or waiving the privilege. As described by one commentator, the potential for manipulation is not insignificant:

Statements in confessions could be inaccurate, and could be intended to mislead, if an unscrupulous confessant thought the statements could be used later in a trial. Due to the belief in the usual truthfulness of facts told during the confession, the testimony of a clergyman concerning the confession might be given too much weight in reaching a finding. Suppose that in a state where there is no privilege, two men, Mr. Badd and Mr. Worse, plan to hold up a small store in a residential neighborhood. Badd pleads with Worse not to take a pistol along, but to no avail. In the hold-up, Worse shoots the old storekeeper. Thereafter, Worse goes to confession and, instead of submitting to the priest his murder of the old man, confesses that he drove the car to the holdup scene and, although he pleaded with Badd not to kill the man, Badd nevertheless did it, and then Worse drove him away from the scene. This confession and admission of guilt to being an accessory before and after the fact, made as a means of shifting the blame for the actual murder from himself to Badd, might be rather potent evidence.
....
The waiver privilege could also be the instrument of abuse by a scheming, wilful, and debased person. He could confess a number of different versions to a number of different priests and then waive the privilege for the one who best suited his purpose but not waive it for the priests who would not serve his purpose.
[Seward P. Reese, Confidential Communications to the Clergy, 24 Ohio St.L.J. 55, 82-85 (1963)].
The rejection may also have been prompted by a view that the privilege was a product of the clergyperson's free exercise of religion and a desire to protect that clergyperson's religious tenets. 1 McCormick on Evidence § 76.2 (Strong ed., 4th ed. 1992). See generally Mary H. Mitchell, Must Clergy Tell? Child Abuse Reporting Requirements Versus the Clergy Privilege and Free Exercise of Religion, 71 Minn.L.Rev. 723, 760-77 (1977) (discussing generally various rationales for the privilege).
[6] We note that the commentator of our present Rules of Evidence views the provision for a waiver to have been in error "because it contradicts the thrust of the rule and the original statute, namely that under no circumstances should a religious figure be considered as a source of evidence of this type." Biunno, Rules of Evidence, comment 1 on Evid.R. 29 (1992). We do not agree. Not only can we not simply ignore the express reference to the Evid.R. 37 waiver, but we think that the expanded scope of not only the persons subject to its restrictions but also the type of communications encompassed may reasonably have prompted a relaxation of the original policy disfavoring a religieuse as a source of competent evidence.
[7] Ala. Code § 12-21-166 (1986); Alaska R.Evid. 506; Ariz. Rev. Stat. Ann. § 12-2233 (1982); Ark.R.Evid. 505; Cal.Evid.Code §§ 1030-34 (West 1966); Colo. Rev. Stat. § 13-90-107 (Supp. 1992); Conn. Gen. Stat. Ann. § 52-146b (West 1991); Del.R.Evid. 505; D.C. Code Ann. § 14-309 (1989); Fla. Stat. Ann. § 90.505 (West 1979); Ga. Code Ann. § 24-9-22 (Michie Supp. 1992); Haw.R.Evid. 506; Idaho Code § 9-203 (1990); Ill. Ann. Stat. ch. 110, para. 8-803 (Smith-Hurd 1984); Ind. Code Ann. § 34-1-14-5 (Burns Supp. 1992); Iowa Code Ann. § 622.10 (West Supp. 1992); Kan. Stat. Ann. § 60-429 (1983); Ky. Rev. Stat. Ann. § 421.210 (Michie 1992); La. Rev. Stat. Ann. § 15:477 (West 1992); Maine R.Evid. 505; Md.Cts. & Jud.Proc.Code Ann. § 9-111 (1989); Mass. Gen. Laws Ann. ch. 233, § 20A (West 1986); Mich. Stat. Ann. § 28.945(2) [M.C.L.A. § 767.5.a(2)] (Law.Co-op.Supp. 1992); Minn. Stat. Ann. § 595.02 (West 1988); Miss. Code Ann. § 13-1-22 (Supp. 1992); Mo. Ann. Stat. § 491.060 (Vernon Supp. 1992); Mont. Code Ann. § 26-1-804 (1991); Neb. Rev. Stat. § 27-506 (1989); Neb.R.Evid. 506; Nev. Rev. Stat. Ann. § 49.255 (Michie 1986); N.H. Rev. Stat. Ann. § 516:35 (Supp. 1991); N.M.R.Evid. § 11-506 (Michie 1986); N.Y.Civ.Prac.L. & R. 4505 (McKinney 1992); N.C. Gen. Stat. § 8-53.2 (1991); N.D.R.Evid. 505; Ohio Rev. Code Ann. § 2317.02 (Anderson 1991); Okla. Stat. Ann. tit. 12, § 2505 (West 1980); Or. Rev. Stat. § 40.260 (1988); 42 Pa. Cons. Stat. Ann. § 5943 (1982); P.R.R.Evid. 28; R.I. Gen. Laws § 9-17-23 (1985); S.C. Code Ann. § 19-11-90 (Law.Co-op. 1985); S.D. Codified Laws Ann. §§ 19-13-16 to -18 (1987); S.D.R.Evid. 505; Tenn. Code Ann. § 24-1-206 (Supp. 1992); Tex.R.Civ.Evid. 505; Tex.R.Crim.Evid. 505; Utah Code Ann. 78-24-8 (1992); Utah R.Evid. 503; Vt. Stat. Ann. tit. 12, § 1607 (1973); Va. Code Ann. § 8.01-400 (Michie 1992) (Civil Remedies and Procedure); Va. Code Ann. § 19.2-271.3 (Michie 1990) (Criminal Procedure); V.I.Code Ann. tit. 5, § 857 (1967); Wash. Rev. Code Ann. § 5.60.060 (West Supp. 1992); W. Va. Code § 57-3-9 (Supp. 1992); Wis. Stat. Ann. § 905.06 (West Supp. 1992); Wyo. Stat. § 1-12-101 (1991).
[8] Some of these provisions utilize both the term "compelled" and "allowed." Yet they also expressly confer on the penitent the right to either consent to disclosure or waive the privilege. This is fully consistent with our view (ante at 106, 622 A.2d at 252) that use of the term "allowed" does not of itself confer on the penitent the privilege, for if it did there would be no need to refer to the penitent's right to consent or waive.
[9] Mo. Ann. Stat. § 491.060 (Vernon Supp. 1992) provides in part:

The following persons shall be incompetent to testify:
* * * * * * * *
(4) Any person practicing as a minister of the gospel, priest, rabbi or other person serving in a similar capacity for any organized religion, concerning a communication made to him in his professional capacity as a spiritual advisor, confessor, counselor or comforter....
Va. Code Ann. § 8.01-400 (Michie 1992) (Civil Remedies and Procedure) and § 19.2-271.3 (Michie 1990) (Criminal Procedure) provide:
No regular minister, priest, rabbi or accredited practitioner over the age of eighteen years, of any religious organization or denomination usually referred to as a church, shall be required in giving testimony as a witness in any civil action to disclose any information communicated to him in a confidential manner, properly entrusted to him in his professional capacity and necessary to enable him to discharge the functions of his office according to the usual course of his practice or discipline, wherein such person so communicating such information about himself or another is seeking spiritual counsel and advice relative to and growing out of the information so imparted.
[10] We caution, as we have previously pointed out, that we express no view as to whether Bischoff is a "clergyman, minister or other person or practitioner authorized to perform similar functions...."